**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

FILED

2012 SEP 10 PM 3: 20

U.S. DISTRICT COURT
MIDDLE DISTRICT OF T

| | | |
|---|---|---|
| **G. KLINE PRESTON, IV** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. _____** |
| | ) | |
| **GREEN BANKSHARES, INC., JAMES E.** | ) | **JURY DEMAND** |
| **ADAMS, STEPHEN M. ROWND, R. STAN** | ) | |
| **PUCKETT, and KENNETH R. VAUGHT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Comes the Plaintiff, G. Kline Preston, IV, by and through Counsel, and sues the Defendants and for cause would state and show as follows: Plaintiffs' information and belief is based upon, among other things, Plaintiff's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Green Bankshares, Inc. ("GRNB" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review of press releases and media reports concerning GRNB; and (c) review of other publicly available information.

1. The Plaintiff avers that GRNB operates as the bank holding company for GreenBank ("GreenBank" or the "Bank"). GRNB was the third-largest bank holding company headquartered in Tennessee, with total assets of approximately $2.4 billion as of December 31, 2010. The Company provided commercial banking services primarily in Tennessee, and, as of December 31, 2010, had 63 branches across East and Middle Tennessee, and one branch each in Bristol, Virginia, and Hot Springs, North Carolina.

1

The Bank offered a range of deposit products and a portfolio of loan products, including: commercial real estate loans; residential and real estate loans, such as one-to-four family, owner-occupied residential mortgage loans; commercial loans for various business purposes, including working capital, inventory and equipment, and capital expansion; and consumer loans for personal, family or household purposes. GRNB also provided wealth management services through its GreenWealth Division and residential mortgage lending through its Mortgage Division. In addition, the Bank conducted separate businesses through three wholly-owned subsidiaries: (1) Superior Financial Services, Inc., a consumer finance company; (2) GCB Acceptance Corporation, a consumer finance company specializing in automobile lending and (3) Fairway Title Co., a title insurance company.

2. The Plaintiff avers that the first two quarters of 2010, GRNB appeared to be profitable and performing well by posting a much lower loan loss provision than expected. On October 20, 2010, however, GRNB announced its financial results for the 2010 fiscal third quarter and disclosed that the Company's net charge-offs increased on a sequential basis to $36.5 million from $4.9 million in the prior quarter. Accordingly, *the Company's net charge-offs for the third quarter of 2010 represented an astonishing 650% increase in net charge-offs from the previous quarter*. The Company's net charge-off for the fourth quarter of 2009 was $6,437,000.00; for the first quarter of 2010 was $3,883,000.00 (-39.68%); for the second quarter of 2010 was $4,868,000.00 (-25.37%); and for the third quarter of 2010 was $36,549,000 (650.80%). *Thus, the Company's third quarter 2010 net charge-off was over 240% more than the three previous quarters combined*. Moreover, the Company indicated that it had engaged an

independent third-party loan reviewer, which contributed to the asset quality impact reflected in its third quarter results. The Company's astonishing increase in its net charge-off for the third quarter of 2010 is reflected in the chart below:

3. The Plaintiff avers upon the announcement of the Company's financial results for the 2010 fiscal third quarter, shares of GRNB declined $2.79 per share, more than 43%, to close on October 21, 2010, at $3.68 per share on unusually heavy volume.

4. The Plaintiff thereafter, on November 9, 2010, after the market closed, the Company announced that in consultation with the Federal Reserve Bank, the Company had given notice to the United States Treasury Department that the Company was suspending the payment of regular quarterly cash dividends on the Company's Fixed Rate Cumulative Perpetual Preferred Stock, Series A, issued to the United States Treasury Department. Further, the Company disclosed that "two large relationships totaling approximately $31.4 million, after charge-offs of $20.7 million," had defaulted during the third quarter. According to the Company, "these interest only and were current but new appraisals ordered r the quarter showed collateral shortfalls that caused the Company to move these relationships to non-accrual and charge them down to the collateral values." On this news, shares of GRNB declined $1.08 per share, more than 29.5%, to close on November 10, 2010, at $2.57 per share, on unusually heavy volume.

5. The Plaintiff avers throughout the Class Period, Defendants made false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and misleading statements and failed to disclose: (1) that the Company was overvaluing the collateral of certain loans; (2) that, as such, the Company was failing to timely take

3

impairment charges to reduce the carrying values of certain loans to appropriate market values; (3) that the Company lacked adequate internal and financing controls; (4) that there was no reasonable factual basis for the Company's valuation of the collateral for certain assets; and (5) that, as a result, the Company's financial statements and results were materially false and misleading at all relevant times.

6. The Plaintiff avers as a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value in the Company's securities, the Plaintiff and others have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The Plaintiff avers that the claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8. The Plaintiff avers that venue is proper in this district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud, or the effects of the fraud, have occurred in this district. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in this district. Additionally, GRNB maintained branches within this district. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

4

## PARTIES

9. The Plaintiff, Preston, purchased GRNB securities during the same period of time as the Plaintiffs in the consolidated class action styled *Burgraff, et al. vs. Green Bank Shares, Inc. et al*, Case No. 2:10-cv-00253, pending in the U.S. District Court for the Eastern District of Tennessee. The Plaintiff suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

10.     The Plaintiff avers that Defendant GRNB was a Tennessee corporation with its principal executive offices located at 100 North Main Street, Greeneville, Tennessee, 37743 for all times material hereto.

11.     The Plaintiff avers that Defendant R. Stan Puckett ("Puckett") was, at all relevant times, Chairman of the Board and Chief Executive Officer ("CEO") of GRNB until his retirement on March 31, 2010.

12.     The Plaintiff avers that Defendant Stephen M. Rownd ("Rownd") was, at all relevant times, Chairman of the Board and CEO of GRNB since March 31, 2010.

13.     The Plaintiff avers that Defendant James E. Adams ("Adams") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of GRNB.

14.     The Plaintiff avers that Defendant Kenneth R. Vaught ("Vaught") was, at all relevant times, the Company's Chief Operating Officer and has served on the Company's Board of Directors since June 2001.

15.     The Plaintiff avers that Defendants Puckett, Rownd, Adams, and Vaught are collectively referred to herein as the "Individual Defendants." Defendants GRNB,

5

Puckett, Rownd, Adams, and Vaught are collectively referred to herein as "Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the day-to-day operations of the Company and to control the contents of GRNB's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Individual Defendants, in fact, exercised such power and authority. Each individual Defendant was provided with copies of the Company's reports and press releases and alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them each Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pled herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

16.     The Plaintiff avers that Defendant, GRNB, operated as the holding company for the Bank, which provides commercial banking services primarily in Tennessee. The Bank offered a range of deposit products and a portfolio of loan products, including: commercial real estate loans; residential real estate loans, such as one-to-four family, owner-occupied residential mortgage loans; commercial loans for various business purposes, including working capital, inventory and equipment, and capital expansion; and consumer loans for personal, family or household purposes.

6

17. Plaintiff avers that in a request dated October 26, 2009, Scott Niswonger ("Niswonder"), a shareholder who owned nearly 10% of the Company's outstanding shares, requested GRNB to consider bolstering the Company's capital in an attempt to resolve any market and regulatory concerns related to future credit deterioration. On November 9, 2009, the Company rejected Niswonder's proposal.

### Materially False and Misleading Statements Issued

18. The Plaintiff avers that on January 19, 2010 the Company issued a press release entitled, "GREEN BANKSHARES REPORTS FOURTH QUARTER RESULTS." Therein, the Company, in relevant part, stated:

> **GREENEVILLE, Tenn. (January 19, 2010)- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today reported a net loss available to common shareholders for the fourth quarter of 2009 of $76,000 compared with a net loss for the third quarter of 2009 of $7.7 million and a net loss of $15.3 million for the fourth quarter of 2008. On a diluted per share basis, the net loss for the fourth quarter of 2009 was $0.01 compared with a net loss of $0.59 for the third quarter of 2009 and a net loss of $1.18 for the year-earlier quarter. Excludin preferred stock dividends paid and accretion of discount on common stock warrants issued to the U.S. Treasury, the Company reported net income of $1.2 million for the fourth quarter of 2009 compared with a net loss of $65 million for the third quarter of 2009 and a net loss of $15.2 million for the fourth quarter of 2008...**
>
> **For the year ended December 31, 2009, the Company re a net loss available to common shareholders of $155.7 million or $11.91 per diluted share, which was affected significantly by an after-tax, non-recurring, non-cash goodwill impairment charge of $137.4 million or $10.51 per diluted share, which was affected significantly by an after-tax, non-recurring, non-cash goodwill impairment charge of $137.4 million or $10.51 per diluted share recorded in the second quarter of 2009. The share forludin the goodwill impairment charge, the Company's net operating loss for 2009 was $18.3 million or $1.40 per diluted share versus net income of $5.5 million or $0.42 per diluted share for the year ended December 31, 2008...**
>
> **Stan Puckett, Chairman and Chief Executive Officer, commented, "Although the economic climate in we operate remains under considerable pressure, *we were pleased to see stabilization in several areas of our business as 2009 came to an end. While NPAs remain elevated, we believe that the credit cycle crested in 2009 and credit costs now have begun to moderate, as seen by lower net loan charge-offs and OREO [other real estate owned] costs*. Also, lower funding costs have continued to drive improvements in net interest income and net interest income and net interest margin. Although we are cautiously optimistic about these positive developments,**

*we will continue to work aggressively to identify and address problem loans in 2010*
and build on the trends that are now emerging in our business."

Non-interest income totaled $8.1 for the three months ended December 31,
2009, down from $9.2 million for the third quarter of 2009 and $10.2 million in the
year-earlier quarter. The sequential quarter decline primarily reflected lower other
income relating to non-recurring items totaling $468,000.00 associated with
insurance proceeds received and a gain on the sale of undeveloped land adjacent to
a branch facility, service charges on deposit accounts, and securities gains, while the
year-over-year quarterly decline was due primarily to lower securities gains. For the
year, non-interest income declined to $31.6 million from $33.6 million in 2008,
primarily due to lower securities gains, including other than temporary impairment
charges, which were offset to some extent by higher service charges. The ongoing
success of GreenBank's High Performance Checking produce added 15,810 net new
checking account customers during the year, for a new account opening ratio of 2.18
new accounts opened for each account closed and increasing deposit service charge
revenues by $562,000.00.
Non-interest expense totaled $20.5 million for the fourth quarter ended
December 31, 2009, compared with $22.4 million for the third quarter of 2009 and
$24.2 million for the fourth quarter of 2008. The decline in non-interest expense of
$1.9 million or 8% from the third quarter was principally due to lower losses on
OREO, while the year-over-year quarterly decline reflected lower OREO losses
offset somewhat by higher FDIC insurance. Non-interest expense for 2009 totaled
$229.6 million, including a one-time, non-cash goodwill impairment charge of $143.4
million. Excluding this impairment charge, non-interest expense for 2009 was $86.2
million, up $361,000.00 or less than 1% from 2008...

(Unless otherwise indicated, all emphasis is added)

19.     The Plaintiff avers that the foregoing statements were materially false and

misleading because:

(a) Defendants were not continuing to work aggressively to identify and

address problem loans. The Plaintiff is informed and believes that one of the two large

relationships that the Company identified in its Form 10-Q filed with the SEC for the

2010 third fiscal quarter as contributing to a significant portion of the deterioration in the

Company's loan portfolio during the quarter ended September 30, 2010 is with Darrell

Tipton ("Tipton"), a real estate agent, and Mike Ross ("Ross"), a real estate developer,

both of Maryville, Tennessee. Specifically, the Bank made a loan to Tipton and Ross in

8

October, 2005 to fund the development of 40 acres adjacent to Asbury Place on Sevierville Road in Maryville. Tipton and Ross are listed as the borrowers by the successor trustee on the trustee's sale notice for the commercial note held by the Bank. In GRNB's Form 10-Q for the third quarter of 2010, the Company stated that the borrowers for the two large relationships that contributed to a significant portion of the deterioration in the Company's loan portfolio during the quarter ended September 30, 2010 "had been paying interest only". In an April 21, 2011 The Daily Times article, Tipton stated that the Bank had been collecting interest only with respect to the loan for the development of the 40 acres adjacent to Ashbury Place. Defendants knew, or were reckless in not knowing, that the loan to fund the development was likely to become impaired because the Bank had previously loaned money to Ross for his Rarity Community resort and residential developments and had foreclosed on some of Ross' developments. Moreover, the Company recklessly failed to discover that Tipton and Ross did not have a contractual arrangement with Asbury Centers, Inc. ("Ashbury Centers"), who sold the 40 acres next to its retirement community in 2005, to buy back independent living residences and place them back on the market, as Asbury Centers had done with residences on its own property. As a result, when Asbury Centers underwent a change in management and developed a new long-range plan that did not include the 40-acre development, Ross and Tipton lost investor interest in the development. Defendants were also aware that loans affiliated with Ross and/or Tipton were likely to become impaired because of information available to Defendants. On March 26, 2009, Robert Stooksbury ("Stooksbury"), one of the original partners in Tellico Landing, LLC, the Rarity Pointe subdivision in Loudon County, Tennessee, filed suit against Ross. Stooksbury alleged that Ross filed false

9

documents through Ross-owned Assurance Title LLC ("Assurance Title"). Specifically, Stooksbury alleged that Assurance Title routinely prepared two sets of settlement statements with differing entries, one that showed actual, true figures to be given to the seller and one with false and misleading figures to be given to the purchasers. The discrepancies alleged by Stooksbury were similar to those found in 2008 concerning properties at Ross's Rarity Bay development in Vonore, Tennessee, when former Loudon County Assessor Doyle Arp reduced the value of Ross-owned lots without explanation. In the subsequent investigation by Loudon County District Attorney General Russell Johnson, several of the deeds to Rarity Bay Properties prepared by Assurance Title came under scrutiny, and, in some cases, the deeds reflected prices that were twice as much as buyers actually paid for the land. Stooksbury's allegations were similar to those that were investigated by the Tennessee Bureau of Investigation regarding properties that Ross sold at his Rarity Bay development along Tellico Lake in Vonore. The allegations in these lawsuits were reported in an April 5, 2009 News Sentinel article entitled "Partner sues Rarity developer." Also in 2009, Stooksbury filed a federal suit against Ross and other Defendants that included accusations of racketeering. Among other things, the lawsuit alleged that over several years, Ross and other Defendants engaged in "repeated insider sham transactions" that were designed to artificially inflate property values, including transactions in which purchasers would obtain immediate kickbacks after buying a property, allowing them to make several month of interest payments without paying out-of-pocket. The suit alleged that Ross and others engaged in a pattern of illegal conduct that was designed to inflate the value of Rarity lots, and that the conduct was a pyramid or Ponzi scheme. Additionally, on September 16, 2008, a lawsuit was filed against Ross'

10

RMT cottages, LLC ("RMT Cottages") and Rarity Communities Inc. alleging, among other things, fraud and breach of contract, and that a title company partially-owned by Ross gave false settlement statements to lot buyers. As a result, Defendants were not continuing to work aggressively to identify and address problem loans because they knew or were reckless in not knowing, that loans affiliated with Ross and/or Tipton were impaired or likely to become impaired, that the Company was overvaluing the collateral of such loans, that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and that there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loans;

(b)     The Plaintiff is also informed and believes that one of the two large relationships that the Company identified in its Form 10-Q filed with the 2010 third fiscal quarter as contributing to a significant portion of the deterioration in the Company's loan portfolio during the quarter ended September 30, 2010 is with Universe LLC ("Universe"), a development firm that, along with Bridgemont Group, attempted to create Bridgemont, a proposed destination resort city within Sevierville, Tennessee. According to a November 27, 2010 *knoxnews.com* article entitled "Bond debt looms in Sevier," Sevierville City Administrator Steve Hendrix ("Hendrix") stated that Universe proposed the idea of a bond sale for the development to pay for a 159-acre park and for payments on debt service. The deal would also give the city collateral for the $6.9 million debt that Universe has owed the city since 2008, when Universe stopped making payments on infrastructure around the Bridgemont site. In a First Priority Deed of Trust and Security Agreement dated April 1, 2008, between Universe as a grantor, Kenneth Clark Hood, a

11

resident of Greene County, State of Tennessee, as a trustee, and GreenBank as a

beneficiary, Universe granted its rights, title and interest in certain tracts, pieces and

parcels of land located in Sevier County, Tennessee, along with improvements thereon, to

secure the payment of an indebtedness for borrowed money in the principal amount not

exceeding $33 million, together with interest thereon, that GreenBank had paid or had

agreed to pay pursuant to a Construction Loan Agreement between Universe and

GreenBank. Universe and GreenBank also entered into a Promissory Note with respect to

this indebtedness, with the final payment due under the Promissory Note due on or before

April, 2010. Plaintiffs allege upon information and belief that Universe did not pay the

full amount owed to GreenBank pursuant to the First Priority Deed of Trust and Security

Agreement and the Promissory Note on or before April 2010. Indeed, in a March 30,

2010 The Mountain Press article entitled, "*Calkin: Working Being Done; Bridgemont

Focus on Completing Plans,*" Bridgemont developer Jim Calkin ("Calkin") conceded that

he was waiting for the market to turn around, and the article reported that "it will take

some time before there is serious movement in Bridgemont." Furthermore, in a letter

dated October 21, 2010 from Calkin to Bryan C. Atchley, Mayor of the City of

Sevierville and Hendrix, Calkin requested the finalization of special assessment bond

financing to be imposed with respect to Bridgemont to help pay back the debt that

Universe owed. In the letter, Calkin also noted that during discussions regarding such

special assessments "there was significant discussion concerning the appraisal of the park

property, including the appraisal performed in 2008 and the necessity for an update. C.B.

Richard Ellis, who performed the appraisal on the park property and the whole

development in 2008, will provide a new appraisal for the park property (159 acres) on or

before Thursday, October 28, 2010." Based upon the plan of financing developed by George K. Baum & Company, approximately $10,200,000.00 of the Series 2010 Bonds will be sold to GreenBank, and the remaining $10,990,000.00 of the Series 2010 Bonds will be sold to other sophisticated investors. As a result, Defendants were not continuing to work aggressively to identify and address problem loans because they knew, or were reckless in not knowing, that the loan affiliated with Universe was impaired or was likely to become impaired, that the Company was overvaluing the collateral of such loan, that the Company was failing to timely take impairment charges to reduce the carrying value of such loan to appropriate market value, and that there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loan;

      (c)     The magnitude of the Company's charge-offs for the third quarter of 2010 further demonstrates the falsity of Defendants' statements and that Defendants acted with knowledge or recklessness. On October 20, 2010, GRNB announced its financial results for the 2010 fiscal third quarter and disclosed that the Company's net charge-offs increased on a sequential basis to $36.5 million from $4.9 million in the prior quarter. Accordingly, the Company's net charge-offs for the third quarter of 2010 represented an astonishing 650% increase in net charge-offs from the previous quarter. The Company's net charge-off for the fourth quarter of 2009 was $6,437,000.00; for the first quarter of 2010 was $3,883,000.00 (-39.68%); for the second quarter of 2010 was $4,868,000.00 (-25.37%); and for the third quarter of 2010 was $36,549,000.00 (650.80%). Thus, the Company's third quarter 2010 net charge-off was over 240% more than the three previous quarters combined;

(d)     Defendants also knew that it was misleading to suggest that the credit cycle had crested in 2009, that credit costs had begun to moderate, and that the Company's business had stablilized because GRNB was overvaluing the collateral of certain loans above appropriate market values and failing to timely take impairment charges to reduce the carrying values of certain loans to the appropriate market values. As GRNB acknowledged in its Form 10-K filed with the SEC on March 15, 2011, the Company did not maintain adequate internal controls surrounding the valuation, documentation, and review of impaired loans and other real estate owned during the Class Period is identified in Burgraff *supra*. The Company's documentation supporting certain impaired loans and other real estate owned charge-offs, moreover- as GRNB also acknowledged in its Form 10-K was lacking in sufficient detail and did not provide adequate evidence of secondary review. Thus Defendants' representation that the Company's business had stabilized was false and misleading. Additionally, through the Company's remediation efforts the Defendants acknowledged that GRNB failed to: (1) order appraisals on impaired assets 90 days prior to the annual appraisal date or when evidence of impairment had occurred; (2) submit appraisals to an independent third party for review upon completion; (3) separately review and discuss in monthly valuation meetings pre-reviewed appraisals indicating evidence that impairment had occurred; (4) ensure that there was adequate documentation of the consideration for recording a potential impairment when the review process was not fully it completed, but where it was profitable that a loss had been incurred; and (5) appropriately document controls evidencing adequate secondary review and approval of impaired loan valuations and

14

other real estate owned. As a result, the Company's financial results were materially false and misleading at all relevant times.

20.     The Plaintiffs avers that on February 25, 2010, GRNB filed its Annual Report on Form 10-K with the SEC for the 2009 fiscal year. The Company's Form 10-K was signed by CEO Puckett and reaffirmed the Company's financial results previously announced on January 29, 2010. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by CEO Puckett and CFO Adams, who certified:

> **1.     I have reviewed this quarterly report on Form 10-K of Green Bankshares, Inc. (the "registrant");**
> **2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
> **3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.**
> **4.     The registrants other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a 15(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:**
> > **a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
> > **b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

21.     The Plaintiff avers that the foregoing statements were materially false and misleading because GRNB admitted that, during the Class Period, the Company did not maintain adequate internal controls surrounding the valuation, documentation, and review of impaired loans and other real estate owned.

Indeed, in the Company's Form 10-K filed with the SEC on March 15, 2011, the Company acknowledged the following:

> As a result of management's evaluation of the Company's internal controls over financial reporting, management identified deficiencies, that when evaluated in combination, lead to the determination that there is a reasonable possibility that the Company's internal controls could fail to prevent or detect a material misstatement on a timely basis as of December 31, 2010. Accordingly, as a result of this material weakness, management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2010. This material weakness relates to controls surrounding the valuation, documentation, and review of impaired loans and other real estate owned at December 31, 2010. As a result of this material weakness, management has adopted a specific action plan to address these deficiencies in internal controls which are discussed in a more detail below in Item 9A. Controls and Procedures.
>
> The Company's independent registered public accounting firm has issued a report on the effectiveness of the Company's internal control over financial reporting. That report appears on pages 57 and 58 of this report.
>
> ### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
> ### BOARD OF DIRECTORS AND SHAREHOLDERS
> ### GREEN BANKSHARES, INC.
>
> We have audited Green Bankshares, Inc. and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control- Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Control over financial standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with

16

generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. A combination of deficiencies noted as of December 31, 2010 give rise to the following material weakness which is included in management's assessment. As of December 31, 2010, the Company did not have adequate internal controls surrounding the valuation, documentation and review of impaired loans and other real estate owed. This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the 2010 consolidated financial statements, and this report does cons affect our report dated March 15, 2011 on those consolidated financial statements.

In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, Green Bankshares, Inc. and subsidiaries has not maintained effective internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control- Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements of Green Bankshares, Inc. and subsidiaries as of December 31, 2010 and 2009 and for each the years in the three-year period ended December 31, 2010, and our report dated March 15, 2011, expressed an unqualified opinion on those consolidated financial statements. Our report on the consolidated financial statements referred to above refers to the adoption of a new accounting standard in relation to accounting for other-than-temporary impairments of debt securities in 2009.

/s/ Dixon Hughes PLLC

Atlanta, Georgia
March 15, 2011

            \*            \*            \*

Evaluation of Disclosure Controls and Procedures
The Company, with the participation of its management, including the Company's Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures (as defined in Rules 13a-15 and 15d-15 under the Exchange Act) as of the end of the period covered by this Report.

Based upon that evaluation and as of the end of the period covered by this Report, the Company's Chief Executive Officer and Chief Financial Officer concluded that, as a result of the deficiencies identified in internal controls that when evaluated in combination give rise to a material weakness and described above under the caption entitled "Management's Report on Internal Control Over Financial Reporting" in Item 8 of this Report, the Company's disclosure controls and procedures were not effective to ensure that information required to be disclosed in its reports that the Company files or submits to the Securities and Exchange Commission under the Exchange Act is recorded, processed, summarized and reported on a timely basis. In light of this material weakness, in preparing the Company's Consolidated Financial Statements included in this Report, the Company performed a thorough review of credit quality, focusing especially on the timely receipt and review of updated appraisals from outside independent third parties and internal supporting documentation to ensure that the Company's Consolidated Financial Statements included in this Report have been prepared in accordance with U.S.GAAP.

            \*            \*            \*

Changes In Internal Control Over Financial Reporting

Management's assessment of the Company's internal control over financial reporting identified deficiencies in the Company's internal control over financial reporting at December 31, 2010 related to: 1) the timely receipt and review of updated appraisals received from outside independent third parties. The increased volume of impaired and nonperforming assets requiring updated valuations during the second half of 2010 resulted in an internal control deficiency related to the timely acquisition and review of these appraisals. 2) A new process was implemented in regards to the establishment of the Special
Assets Group where appraisals, once received, are sent to an independent external appraisal review service. Controls surrounding this process in regards to the potential impairment of an asset prior to the completing of our review process are in the process of being documented. 3) Documentation and review of supporting documentation relating to impaired loans and other real estate owned. Areas were identified where the documentation supporting certain impaired loans and other real estate owned charge offs were lacking in sufficient detail and did not provide

18

adequate evidence of secondary review. **Other than the remediation plan identified below for these deficiencies, there were no changes in the Company's internal control over financial reporting that occurred during the fourth quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.**

**Remediation plan for significant deficiencies in internal control over financial reporting:**

Prior to and subsequent to December 31, 2010, and following management's identification of the above-referenced deficiencies, management began taking steps to remediate those identified. These ongoing efforts that commenced during 2010 and continuing on in 2011 included the following:

-       During the fourth quarter and as of December 31, 2010 all appraisals on impaired assets are, and will continue to be, ordered 90 days prior to the annual appraisal date, or when evidence of impairment has occurred, and submitted to the independent third party for review upon completion, in order to assure that all appraisals on impaired assets are received in accordance with the Company's internal policies;

-       Pre-reviewed appraisals indicating evidence that impairment has occurred will be separately reviewed and discussed in held the monthly valuation meeting held between the Special Assets Group, Loan Review and Accounting to ensure that there is adequate documentation of the consideration for recording a potential impairment when the review process is not 100% complete but it is probable that a loss has been incurred; and

-       Controls evidencing adequate secondary review and approval of impaired loan valuations and other real estate owned will be appropriately documented and evident within the Special Assets Group.

19

Management anticipates that these remedial actions will strengthen the Company's internal control over financial reporting and will address the individual deficiencies identified as of December 31, 2010. Because some of these remedial actions will take place on a quarterly basis, their successful implementation will continue to be evaluated before management is able to conclude that the deficiencies have been remediated.

22. The Plaintiff avers that on February 25, 2010, the Company filed its Form 10-K for the period ended December 31, 2009. The Company's Form 10-K in relevant part, stated:

**Provision for Loan Losses. Management assesses the adequacy of the allowance for loan losses by considering a combination of regulatory and credit risk criteria. The loan quality entire loan portfolio is graded and potential loss factors are assigned accordingly. The potential loss factors for impaired loans are assigned based on independent valuations of underlying collateral and management's judgment. The potential loss factors associated with unimpaired loans are based on a combination of both internal and industry net loss experience, as well as management's review of trends within the portfolio and related industries.**

**Generally, commercial real estate, residential real estate and commercial loans are assigned a level of risk at inception. Thereafter, these loans are reviewed on an ongoing basis. The review includes loan payment and collateral status, borrowers' financial data and borrowers' internal operating factors such as cash flows, operating income, liquidity, leverage and loan documentation, and any significant change can result in an increase or decrease in the loan's assigned risk grade. Aggregate dollar value by risk grade is monitored on an ongoing basis. The establishment of and any changes to risk grades for consumer loans are generally based upon payment performance.**

**The Bank's loan loss allowance is increased or decreased based on management's assessment of the overall risk of its loan portfolio. Occasionally, a portion of the allowance may be allocated to a specific loan to reflect unusual circumstances associated with that loan.**

**Management reviews certain key loan quality indicators on a monthly basis, including current economic conditions, historical charge-offs, delinquency trends and ratios, portfolio mix changes and other information management deems necessary. This review process provides a degree of objective measurement that is used in conjunction with periodic internal evaluations. To the extent that this process yields differences between estimated and actual observed losses, adjustments are made to provisions and/or the level of the allowance for loan losses.**

Increases and decreases in the allowance for loan losses due to changes in the measurement of impaired loans are reviewed monthly given the current economic environment. To the extent that impairment is deemed probable, an adjustment is reflected in the provision for loan losses, if necessary, to reflect the losses inherent in the loan portfolio. Loans continue to be classified as impaired unless payments are brought fully current and satisfactory performance is observed for a period of at least six months and management further considers the collection of scheduled interest and principal to be probable.

The Company's provision for loan losses decreased slightly for the year 2009 by $2,564.00 to $50,246.00 from $52,810.00 in 2008 while the total loan loss reserve increased from $48,811.00 at December 31, 2008 to $50,161.00 at December 31, 2009. In 2009, net charge-offs were $48,896.00 compared with net charge-offs of $38,110.00 in 2008. Management continually evaluates the existing portfolio in light of loan concentrations, current general economic conditions and economic trends. Beginning in the fourth quarter of 2009, on a monthly basis, the Company undertakes an extensive review of every loan in excess of $1 million that is adversely risk graded. Prior to the fourth quarter of 2009 this review had been performed during the final month of each quarter. Throughout 2009 and as a result of this review process, the Company ordered new appraisals of adversely graded real estate secured loans and, following receipt of those appraisals, began aggressively charging off collateral shortfalls/ balances as appropriate. Appraisals revived by the Company during the second quarter of 2009 on existing OREO and targeted loans reflected significant deterioration in the value of the underlying properties, which along with the deterioration of previously performing relationships, triggered increased charge-offs during this quarter and continued into the third quarter of 2009. Management believes that the economic slowdown in the Company's markets occurred throughout 2008 and most of 2009 with beginning signs of economic stabilization in Tennessee occurring late in 2009. Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the residential real estate for loan losses is adequate at December 31, 2009. However, the provision for loan losses could further increase throughout 2010 if the general economic trends begin to reverse and conditions continue to weaken or the residential real estate markets in Nashville or Knoxville or the financial conditions of borrowers deteriorate beyond management's current expectations.

The ratio of nonperforming assets to total assets was 5.07% at December 31, 2009 and 2.61% at December 31, 2008 reflecting not only the recessionary environment but also the rise in non-performing asset levels combined with a shrinking Balance Sheet. Total non-performing assets increased to $132,726.00 in 2009 from $76,806.00 at year-end 2008. Nonaccrual loans, included in non-performing assets, increased to $75,411.00 at December 31, 2009 from $30,926.00 at December 31, 2008. Further reflecting the economic downturn, OREO and repossessed assets increased from $45,371.00 at the end of 2008 to $57,168.00 at year-end 2009. *Management believes that, based upon recent appraisals, these assets have been appropriately written down and they do not anticipate any material losses, based on current economic conditions.* Total impaired loans, which include substandard loans as well as nonaccrual loans, increased from $47,215.00 at

December 31, 2008 to $115,238.00 at December 31, 2009. The Company records a risk allocation allowance for loan losses on impaired loans where the risk of loss is deemed to be probable and the amount can be reasonably estimated. Further, the Company specifically records additional allowance amounts for individual loans when the circumstances so warrant. For further discussion of nonperforming assets as it related to foreclosed real estate and impaired loans, see "ITEM 1. Business- Lending Activities- Past Due, Special Mention, Classified and Nonaccrual Loans" located above.

To further manage its credit risk on loans, the Company maintains a "watch list" of loans that, although currently performing, have characteristics that require closed supervision by management. At December 31, 2009, the Company had identified approximately $212,288.00 in loans that were placed on its "watch list" compared to $182,984.00 as of December 31, 2008. If, and when, conditions are identified that would require additional loan loss reserves to be established due to potential losses inherent in these loans, action would then be taken.

Past Due, Special Mension, Classified and Nonaccrual Loans. The Company classifies its loans of concern into three categories: past due loans, special mension loans and classified loans (both accruing and non-accruing interest).

When management determines that a loan is no longer performing and that collection of interest appears doubtful, the loan is placed on nonaccrual unless they are adequately secured and there is reasonable assurance of full collection of principal and interest. Management closely monitors all loans that are contractually 90 days past due, treated as "special mention" or otherwise classified or on nonaccrual status. Nonaccrual loans that are 120 days past due without assurance of repayment are charged off against the allowance for loan losses.

The Company may elect to formally restructure a loan due to the weakening credit status of a borrower so that the restructuring may facilitate a repayment plan that minimizes the potential losses that the Company may have to otherwise incur. At December 31, 2009, the Company had $16,061.00 of restructured loans of which $4,429.00 was classified as non-accrual and the remaining were performing. There were no restructured loans at December 31, 2008.

23.     Plaintiff avers that the foregoing statements were materially false and

misleading because, as explained more fully in §§25 and 27, Defendants: (1) failed to

undertake an extensive review on a monthly basis of every loan in excess of $1 million

that was adversely graded; (2) failed to aggressively charge off collateral shortfalls and

balances after ordering new appraisals of adversely-graded real estate secured loans; and

(3) lacked a reasonable basis to represent that the Company's allowance for loan losses

was adequate and that the Company had appropriately written down nonperforming

22

assets and nonaccrual loans because Defendants knew, or were reckless in not knowing, that loans affiliated with Ross, Tipton and/or Universe were impaired or likely to become impaired, that the Company was overvaluing the collateral of such loans, that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and that there was no reasonable factual basis for the Company's valuation of the collateral associated with such loans. As a result, the Company's financial results were materially false and misleading at all relevant times.

24.     On April 14, 2010, Ross filed voluntary petitions for bankruptcy on behalf of several entities that he owned and/or managed for which GreenBank was a creditor. Specifically, Ross filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Tennessee on behalf of RMT Cottages, a corporation that Ross managed. In its bankruptcy petition, RMT Cottages listed GreenBank as a creditor to RMT cottages. On the same day, Ross also filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Tennessee on behalf of Pine Mountain Properties, LLC ("Pine Mountain"), another corporation that Ross managed. In its bankruptcy petition, Pine Mountain listed GreenBank as a creditor to Pine Mountain. Also on Aril 14, 2010, Ross filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Tennessee on behalf of PM Properties of Tennessee, L.P. ("PM Properties"), a partnership in which Ross served as a partner. In its bankruptcy petition, PM Properties estimated its assets between $1 million to $10 million and its liabilities at between $10 million and $50 million. Additionally, in its bankruptcy petition, PM Properties listed GreenBank as a creditor to PM Properties. Accordingly, through these bankruptcy

23

petitions, Defendants knew, or were reckless in not knowing, that loans affiliated with Ross and/or Tipton were impaired or likely to become impaired, that the Company was overvaluing the collateral of such loans, that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and that there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loans.

25. Plaintiff avers that on April 21, 2010, the Company issued a press release entitled, "Bankshares Posts First Quarter Earnings of $1.9 Million." Therein, the Company, in relevant part, stated:

> **GREENVILLE, Tenn.- (Business Wire)- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today reported net income available to common shareholders of $1,946,000.00 for the first quarter of 2010 compared with a net loss available to common shareholders of $76,000.00 for the fourth quarter of 2009 and net income available to common shareholders of $3,548,000.00 in the year-earlier quarter. Net income available to common shareholders was $0.15 per diluted share compared with a net loss of $0.01 per diluted share for the fourth quarter of 2009.**
> **Excluding preferred stock dividends paid and the accretion of discount on common stock warrants issued to the U.S. Treasury, the Company reported net income of $3,196,000.00 for the first quarter of 2010 compared with net income of $1,174,000.00 for the fourth quarter of 2009 and $4,780,000.00 in the year earlier quarter.**
>
> *   *   *
>
> **Stephen M. Rownd, newly appointed Chairman and Chief Executive Officer, commented, "*The solid underpinnings of our company's core earnings potential are beginning to become more evident as we emerge from this recessionary cycle.* After having recently visited with our management and bankers in all three of our operating regions, I am impressed by caliber of our team and their drive and determination to move GreenBank forward in these challenging times. I am cautiously optimistic that with the further hard work and dedication of our employees and management, *we will continue to make further strides in improving the Company's performance as this year continues to unfold.*"**
>
> *   *   *
>
> **Non-interest income totaled approximately $7.7 million for the first quarter of 2010 compared with $8.1 million on a linked quarter basis and $6.9 million for the first quarter of 2009. Non-interest income for the fourth quarter of 2009 included approximately$238,000.00 of net securities gains. Deposit service charges**

24

increased $584,000.00 from first quarter 2009 levels due to the continued success of the Company's High Performance Checking product and its strong attraction to new customers. The decline in deposit service charges from the fourth quarter of 2009 reflected historical seasonal patterns relating to the impact of income tax refunds on customer account balances.

Non-interest expenses totaled approximately $20.5 million in the first quarter of 2010 and were relatively flat compared with the fourth quarter of 2009 despite FICA and other employment tax increases that seasonally impact non-interest expense levels. The temporary increases associated with payroll taxes were partially offset by a reduction of $642,000.00 in losses incurred on the disposition of OREO properties versus the fourth quarter of 2009. Compared with the first quarter of 2009, non-interest expenses increased $2.7 million or 15%. Although payroll-related costs declined approximately $345,000.00, this decrease was more than offset by higher product advertising costs of $534,000.00, increased losses on the disposition of OREO property of $428,000.00, and elevated collection and repossession costs of almost $990,000.00.

26.     The Plaintiff avers that the foregoing statements were materially false and misleading because the Company's core earnings potential was not solid and Defendants were not improving the Company's performance because Defendants knew, or were reckless in not knowing, that loans affiliated with Ross, Tipton and/or Universe were impaired or likely to become impaired, that the Company was overvaluing collateral of such loans, that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and that there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loans. As a result, the Company's financial results were materially false and misleading at all relevant times.

27.     The Plaintiff avers that on May 4, 2010, Ross filed voluntary petitions for bankruptcy on behalf of several additional entities that he managed for which GreenBank was a creditor. Specifically, Ross filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Tennessee on behalf of PM Properties No. 2 of Tennessee, LP ("PM Properties No. 2"), a partnership in which Ross served as

25

the managing partner. In its bankruptcy petition, PM Properties No. 2 listed GreenBank as a creditor to PM Properties No. 2, with an amount of claim for a bank loan for land located in Campbell County, Tennessee, listed at $7,271,870.00 (collateral of $188,600.00 and unsecured of $7,271,870.00). In its bankruptcy petition, PM Properties No. 2 estimated its assets at between $100,001.00 to $5000,000.00 and its liabilities at between $1,000,001.00 and $10 million. On the same day, Ross also filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Tennessee on behalf of PM Properties No. 3, LP ("PM Properties No. 3"), another partnership in which Ross served as the managing partner. In its bankruptcy petition, PM Properties No. 3 listed GreenBank as a creditor to PM Properties No. 3, with an amount of claim for a bank loan for land located on Campbell County, Tennessee, listed at $7,460,470.00 (collateral of $290,800.00 and unsecured of $7,169,670.00). In its bankruptcy petition, PM Properties No. 3 estimated its assets at between $100,001.00 to $500,000.00 and its liabilities at between $1,000,001.00 and $10 million. Accordingly, through these bankruptcy petitions, Defendants knew, or were reckless in not knowing, that loans affiliated with Ross and/or Tipton were impaired or likely to become impaired, that the Company was overvaluing the collateral of such loans, that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loans.

28. The Plaintiff avers that on May 7, 2010, GRNB filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal first quarter. The Company's Form 10-Q was signed by CFO Adams and reaffirmed the Company's financial results previously

26

announced on April 21, 2010. Additionally, the Company's Form 10-Q also contained Sarbanes-Oxley required certifications signed by CEO Rownd and CFO Adams, substantially similar to the certifications pled herein, which were materially false and misleading for the reasons identified herein.

29.     The Plaintiff avers that on May 7, 2010, the Company filed its Form 10-Q with the SEC for the three months ended March 31, 2010. The Company's Form 10-Q, in relevant part, stated:

Provision for Loan Losses. During the three months ended March 31, 2010, loan charge-offs were $4,733.00 and recoveries of charged-off loans were $850.00. The Company's provision for loan losses increased to $3,889.00 for the three months ended March 31, 2010, as compared to $985.00 for the same period in 2009. Compared with the fourth quarter of 2009, the provision for loan losses declined by $2,513.00 as the Company experienced lower loan defaults during the first quarter of 2010 with net loan charge-offs declining from $6,437.00 in the fourth quarter of 2009 to $3,883.00 during the first quarter 2010. The Company's allowance for loan losses increased slightly to $50,167.00 at March 31, 2010 from $50,161.00 at December 31, 2009 and the reserve to outstanding loans ratio increased to 2.52% from 2.45% at December 21, 2009 and 2.19% at March 31, 2009. Credit quality ratios had generally declined since September 20, 2007 through the second quarter of 2009, principally as a result of the prolonged deterioration of the residential real estate construction and development market, beginning in the fourth quarter of 2007, in the Company's urban markets, primarily Nashville and Knoxville. Beginning late in the third quarter of 2009 the Company began to witness economic stabilization beginning to materialize in certain of its major markets with this trend continuing through the first quarter of 2010. Management continually evaluates the Company's credit policies for effective risk and control management. The ratio of allowance for loan losses to nonperforming loans was 78.85%, 66.39%, and 45.16% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively, and the ratio of nonperforming assets total assets was 5.27%, 5.07% and 4.34% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively. The ratio of nonperforming loans to total loans, net of unearned interest, was 3.19%, 3.70% and 4.84% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively. Within the Bank, the Company's largest subsidiary, the Company's largest subsidiary, the ratio of nonperforming assets to total assets was 5.25%, 5.04% and 4.31% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively.

Based on management's calculation, an allowance of $50,167.00, or 2.52% of total loans, net of unearned income, was an adequate estimate of losses inherent in the loan portfolio as of March 31, 2010. This estimate resulted in a provision for loan losses in the income statement of $3,889.00 for the three months ended March

31, 2010. If the economic conditions, loan mix and amount of future charge-off percentages differ significantly from those assumptions used by management in making its determinations, the allowance for loan losses and provision for loan losses on the income statement could be materially affected.

The Company's year-to-date net charge-offs as a percentage of average loans increased from 0.03% (annualized 0.12%) for the three months ended March 31, 2009 to 0.19% (annualized 0.76%) for the three months ended March 31, 2010. Net charge-offs as a percentage of average loans were 2.25% for the year ended December 31, 2009.

Management believes that credit quality indicators will be driven by the current economic environment and the resiliency of residential real estate market. Management continually evaluates the existing portfolio in light of loan concentrations, current general conditions and economic trends. Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the allowance for loan losses is adequate at March 31, 2010. However, the provision for loan losses could further increase for the entire year of 2010 if the general economic conditions continue to weaken or the residential real estate markets in Nashville, Knoxville or the Company's other markets or the financial conditions of borrowers deteriorate beyond management's current expectations.

30. The Plaintiff avers that the foregoing statements were materially false and misleading because Defendants, (1) falsely and misleadingly represented that credit quality ratios had generally declined, principally as a result of the prolonged deterioration of the residential real estate construction and development market, when it was Defendants' failure to adequately ensure against the impairment of the Company's loans and to adequately ensure against the impairment of the Company's loans and adequately provision for loan losses that principally contributed to the Company's decline in credit quality ratios; (2) failed to continually evaluate the Company's credit policies and procedures for effective risk and control management and failed to continually evaluate the existing portfolio in light of loan concentrations, current general economic conditions and economic trends; and (3) lacked a reasonable basis to represent that the Company's allowance for loan losses was adequate because Defendants knew, or were reckless in now knowing, that loans affiliated with Ross, Tipton and/or Universe

28

were impaired or likely to become impaired, that the Company was overvaluing the collateral of such loans that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and that there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loans. As a result, the Company's financial results were materially false and misleading at all relevant times.

31.     The Plaintiff avers that during the Class Period, Defendants became further aware of information concerning the Company's relationships with borrowers that, upon information and belief, contributed to a significant portion of the deterioration in the Company's loan portfolio during the quarter ended September 30, 2010. For instance, a May 16, 2010 *knoxnews.com* article, entitled, "Mike Ross- visionary behind Rarity communities- now wonders where it all went bad," stated, in part:

> **Mike Ross built an empire by seeing things that didn't exist. Where others saw an undeveloped peninsula on Tellico Lake, the Maryville businessman envisioned a residential community with fairways, horse trails and hundreds of home sites.**
> **In his mind's eye, a vast tract of mountain terrain in coal country near the Kentucky-Tennessee border became a bustling community of retirees, golfers and retail shops, all made possible by a new interchange connecting the property to Interstate 75.**
> **The developer's ambition spanned projects across East Tennessee, but Ross wasn't a solitary dreamer. Instead, his vision was married to an evangelist's zeal that convinced retirees and homebuyers from California to Connecticut that East Tennessee was the place to live out their retirement dreams- or, if nothing else, to make a big profit outside the swings of the stock market.**
> **Dreams don't always come true, though, and these days the architect of the Rarity Communities brand is living a nightmare.**
> *A bank has foreclosed on two projects involving the company, another has ended up in bankruptcy court, and at least two of Ross' former business partners have sued him, including one federal lawsuit that accuses him of racketeering activity and operating a Ponzi scheme. And two limited partnerships managed by Ross, PM Properties No. 2 of Tennessee and PM Properties No. 3, filed for bankruptcy protection May 4.*

29

*In addition, a prosecutor from West Tennessee is looking into questions regarding assessments at a rarity project in Loudon County.*

Ross isn't the only one who's hurting. Buyers at some Rarity properties have found that promised amenities have not been completed, while foreclosure proceedings initiated against some cash-strapped municipal governments have been unable to collect property taxes owed by Rarity.

Ross' company has had its share of successes, and it certainly isn't the only development firm facing unpaid tax bills, bank foreclosures and angry buyers, but the aggressive push to make its name synonymous with luxury living in East Tennessee has magnified the scope of Rarity's failures. For the 60-year-old Ross himself, the collapse has resulted in "a lot of worry, a lot of stress".

"I don't enjoy not being able to pay my bankers, my creditors, my suppliers," he said. "It's a big strain." And what does the future hold? "My crystal ball is not real good," he said wryly.

Deal-making Whirlwind

While Rarity eventually expanded throughout East Tennessee, the company began with a single project. Rarity Bay was built on a peninsula straddling the Monroe-Loudon County line, which had been owned by the Tellico Reservoir Development Agency.

Rarity Bay included many of the hallmarks of later Rarity projects: high-profile partners, deals with a public entity and land with fabulous views. Ross won the right to develop the project in 1993, heading up a team that outbid Arkansas-based Cooper Communities, Inc. to buy the land from TRDA, an agency created by the Tennessee Legislature in 1983 to assist in the development of land taken by TVA for the Tellico Dam project.

As part of his pitch, Ross lined up former University of Tennessee football stars- including Reggie White and Tim McGee- as investors, with White, a defensive lineman who was posthumously elected to the Pro Football Hall of Fame in 2006, even attending the meeting where TRDA accepted the company's bid.

While pigskin cash was touted as a source of funding for the project, Ross said that ultimately the athletes ended up buying his interest in another project and he ended up with Rarity Bay and some money. After winning the bid, Ross' firm also ended up borrowing more than $9 million from TRDA, according to a deed on file in Loudon County.

"We were originally planning to pay them in cash, and offered them a proposition whereby they would... hold part of the financing for us," he said. "And they accepted our proposition. It actually enhanced their return, what we proposed to them."

Construction on the Rarity Bay information center began in 1996, but over the next decade Ross was a deal-making whirlwind, snapping up acreage cross East Tennessee.

In 1997, he paid just more than $700,000.00 to buy more than 4,600 acres of mountainous terrain in Campbell County atop Jellico Mountain, the property that eventually would become Loudon County. In 2006, Ross formed a paid of alliances, including a link with Chattanooga developer John "Thunder" Thornton. A prominent University of Tennessee booster and former UT trustee, Thornton had

30

engineered a controversial land swap with TVA that enabled him to buy 578 acres on Nickajack Lake in Marion County. Ross eventually bought the project- as part of a deal in which Thornton would receive a cut of the lot sales- and finalized the land acquisition in June 2006.

By 2007, there were at least nine Rarity projects in the works, and the company had built a marketing machine that relied on high-tech Internet advertising and old-fashioned sales techniques like helicopter rides for prospective buyers. People who know Ross describe him as an easy-going, low-key personality, but there was nothing easy-going about the pace of development embraced by his company. In an interview this month, Ross said Rarity saw the opportunity afforded by 78 million baby boomers, and the business plan to get as much of the best property in East Tennessee as quickly as it could.

"The window, the time to acquire the property, you know, before the prices went sky-high and East Tennessee, to a certain degree, got discovered.. was short," he said.

'Too big, too fast'

One perspective holds that Ross tried to do too much too soon.

*"Rarity, in a nutshell, grew too big, too fast," said Marian Schaffer, principal of a Chicago-based real estate firm called Southeast Discovery. "And they got way ahead of themselves because they would start one community and before completing that community they would start another. And there wasn't enough of a foundation on their initial communities to foster that type of growth and development"*

Schaffer's company runs a website and generates most of its revenue through referral fees for linking buyers with agents or developers. She said none of her clients have ever purchased property in a Rarity community, although the company is listed on her website.

*When it comes to blame, Schaffer cast a wide net, saying the developer, appraisers, banks and even lot buyers themselves share the blame for thinking of real estate as a way to get rich quick.*

*"It should not all fall on one entity," she said. "It's four moving parts."*

Ross said that in retrospect the tipping point for his company was when Wall Street giants like Bear Sterns and Lehman Brothers collapsed, and that by the fall of 2008- when the nation's economic crisis was in full bloom- sales revenue at the company had dropped by 80 to 90 percent. In response to Schaffer's criticism, Ross commented that "I would say she... wouldn't understand what we are trying to achieve." But he also said that in retrospect "if I hadn't have grown as fast as I did, I wouldn't.. have nearly the problems I have."

Kickback allegations, a state investigation

Others, however, have raised more pointed questions and suspicions about the way Rarity did business. A lawsuit filed in Colorado alleged, among other things, that a title company partially owned by Ross gave false settlement statements to come lot buyers.

Ross said in 2009 that the suit had no merit. A settlement was reached, and it was dismissed in January. *Also in 2009, Robert Stooksbury- one of Ross' partners on the Rarity Pointe project- filed a federal suit against Ross and other defendants that includes accusations of racketeering. Among other things, the ongoing suit alleges that*

31

*over several years, Ross and other defendants engaged in "repeated insider sham transactions" that were designed to artificially inflate property values, including transactions in which purchasers would get immediate kickbacks after buying a property, allowing them to make several months of interest payments without paying out of pocket. The suit alleged that Ross and others engaged in a pattern of illegal conduct that was designed to inflate the value of Rarity lots, and that the conduct was a pyramid or Ponzi scheme.*

While Ross has not filed a response to the most recent version of that lawsuit, he issued a statement last year saying he believes that "the only disputes between the parties are simply matters of accounting, with Mr. Stooksbury saying that money is owed to him and Mr. Ross asserting that Mr. Stooksbury owes money to Mr. Ross." Through an attorney, Stooksbury declined to comment.

*In addition to the lawsuits, a district attorney general from Ripley, Tenn., Mike Dunavant, is looking into property assessments and irregularities in documents linked to lots sold at Rarity Bay. The investigation stems from a 2008 discovery by Loudon County's assessor that 2005 property tax assessments for about 175 properties at Rarity Bay had been lowered by the formed assessor. Ross owned almost all properties in question.*

Dunavant said a TBI investigation is ongoing, and that it's taking time for him to process the multiple volumes of documents that need to be reviewed. "And once I have an ability to digest that, to understand what the issues are and to get up there to meet with witnesses) I'll be making a charging decision one way or another," he said. "I'm working as quickly as I can." Ross said Dunavant has not interviewed him, adding "I'm not sure what he's investigating." Whether he faces any legal jeopardy or not, it's clear that Ross has been through the emotional wringer in recent months. In an autobiographical account of his company submitted to the News Sentinel, Ross recounted the disastrous period when the national economic meltdown left him fighting for his survival.

*"I talked with my bankers daily," he wrote. "We had the same questions- how did things get so bad, so fast? I found myself saying 'I'm sorry' on an almost hourly basis. Whether I was terminating the employment of a loyal and (dedicated) staff member or explaining why I couldn't make promised payments, it seemed there was just nothing else to say."*

32.     Similarly, a May 16, 2010 *knoxvillebiz.com* article entitled "Loudon,

Monroe Rarity Community Starts Strong, But Appraisal Problems Arise" stated, in part:

VONORE, Tenn.- Of all the projects connected with the Rarity brand, Rarity Bay in Loudon and Monroe counties stands out as a nationally known example of a successful luxury retirement community. In 1994, developer Mike Ross purchased the initial 960 acres of land for Rarity Bay from the Tellico Reservoir Development Agency for $9 million, or about $10,000.00 per acre. By 1996, roads, water and sewer were in place and waterfront lots were beginning to sell, some for as little as $85,000.00. Two years later, the development was recognized in "Where to Retire" Magazine as one of the "Top 100 Retirement Places". At the height of the

housing market, half-acre waterfront lots in the more exclusive parts of Rarity Bay sold for around $1 million.

Strong start

Although Rarity Bay followed in the successful footsteps of its lake neighbor, Cooper Communities' Tellico Village, Ross developed a unique vision of what the development would look like. Rarity Bay differed from Tellico Village in the use of design guidelines that ensured a consistent look for condominiums and custom homes. Ross said he also invested a lot of time visiting other parts of the country to learn more about the construction history. He also began to learn more about the mass of baby boomers who were driving the need for communities such as Rarity Bay.

"I learned a lot about this business," Ross said. "It's about place-making, starting with exceptional land with may natural attributes, hiring experienced development consultants, working managers and caring staff to create the master concept plan."

Part of the concept plan involved aggressive marketing, not just locally, but at real estate investment seminars from Maryland to Colorado. By the end of 1998, Rarity Bay had acquired more than 20,000 names in its marketing database and had sold more than 150 custom home sites, Ross said. By 2005, the real estate boom was still building and Rarity Bay had reached the sale of almost 50 percent of its planned 1,600 total units. More than 300 homes also had been built, Ross said.

"Everyone was forecasting nothing but good news for real estate developers," Ross said.

Suspect Appraisals

*2005 also was an appraisal year in Loudon County, and not surprisingly property values had risen considerably in Rarity Bay. Lots in the exclusive pennisula section of Rarity Bay that had been valued at $500,000.00 just a year or two before were appraised at close to $1 million.*

*For some owners, the appreciating appraisals seemed too much to believe, at least compared with some parcels owned by Ross in the development. Frank Renkel of San Marco Island, Fla., bought lot 990R in August 2004 for $500,000.00. When he received his tax bill, he checked into the vale of other lots in his part of the development. With the help of newly elected Loudon County Assessor Chuck Jenkins, Renkel discovered that his property was now valued at $900,000.00. He also learned that lots adjacent to his that were opened by Ross were assessed based on a value of $500,000.00.*

*"It didn't seem fair," Renkel said.*

*Jenkins discovered that previous Loudon County Assessor Doyle had lowered the assessments representing about $11 million in assessed value on 175 Ross-owned lots in Rarity Bay. There were no records supporting the reductions, Jenkins said. Arp, the current Loudon County Mayor, said that the reductions were based on legitimate requests from property holders including Ross. In 2008, Ross said he did not request the reductions. In an interview earlier this month Ross said that he did request reductions on some lots in Rarity Bay, not in writing, but in phone conversations with Arp. A clerk in the assessor's office provided Jenkins with an affidavit stating that she had entered the reductions into the tax records database at Arp's instructions. She also*

33

*said that Arp asked her to destroy the records. Jenkins disclosed in late 2009 that he had discovered similar assessment reductions made by Arp at 35 Ross-owned lots in the Rarity Pointe development on Tellico Lake near Lenoir City. Ross denies making any kind of deal with Arp to lower the assessments.*

*He hired Arp's son Richard in 2006 as a salesman at Rarity Bay, although the younger Arp had no real estate experience.*

*"He was a basketball coach," Ross said. "He seemed like a nice guy. I thought he could sell."* Neither Mayor Arp nor his son has replied to requests for an interview.

Inflated values

*After months of looking at deeds filed for properties purchased at Rarity Bay, Jenkins contacted 9th Judicial District Attorney General Russell Johnson. He provided Johnson with information about reduced assessments. He also showed Johnson examples of deeds in which the values recorded for lots sold at Rarity Bay had been changed, sometimes inflated by as much as 100 percent. On the deed filed for the Renkel property, for example, the value of the transaction had been changed from $500,000.00 to $865,000.00. Littleton said it was not unusual to see changes on closing documents.*

*All the deeds had been prepared by Assurance Title, a company in which Ross was a partner.*

Ross said he does not know why the changes were made on the documents because he was not involved in day-to-day operations at Assurance Title. The value shown on the deed should reflect the true value of the property and may be higher than the price paid, he said.

Tracy Riedl, a partner in Assurance who has been described as being in charge of day-to-day operations, declined to comment because pending litigation.

In 2008, Johnson predicated a yearlong Tennessee Bureau of Investigation probe of the assessments and the changes on the deeds, which was referred early this year to District Attorney General Mike Dunavant of McNairy Country in West Tennessee for further investigation.

33.    The Plaintiff avers that on June 4, 2010, the Company announced the resignation of its controller, Glen Allen.

34.    The Plaintiff avers that on July 21, 2010, the Company issued a press release entitled "Green Bankshares Reports Second Quarter Net Income of $1,561,000.00 or $0.12 Per Diluted Share." Therein, the Company, in relevant part, stated:

GREENEVILLE, Tenn.- (BUSINESS WIRE)- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today reported net income available to common shareholders of $1,561,000.00 for the second quarter of 2010 compared with net income available to common shareholders of $1,946,000.00 for the first quarter of 2010 and a net loss available to common shareholders of

$151,400,000.00 for the second quarter of 2009. The net loss for the second quarter of 2009 primarily reflected a non-cash, one-time goodwill impairment change totaling $143,389,000.00; excluding this impairment charge, the net operating loss for the year-earlier quarter was $13,986,000.00 (please refer to the non-GAAP measurement reconciliation on page 5). For the six months ended June 30, 2010, net income available to common shareholders totaled $3,507,000.00 compared with a net loss available to common shareholders of $10,438,000.00 for the same period a year ago after excluding the onetime, non-cash, after-tax goodwill impairment charge of $137,414,000.00.

On a diluted per share basis, net income available to common shareholders totaled $0.12 for the second quarter of 2010 and $0.15 for the first quarter of 2010 compared with a net loss available to common shareholders totaled $0.27 compared with a net loss available to common shareholders of $0.80 per diluted share for the first six months of 2009 after excluding the impact of the non-cash, after-tax goodwill impairment charge of $10.52.

Excluding preferred stock dividends paid to the U.S. Treasury and the accretion of discount on common stock warrants issued to the US Treasury, the Company reported a net income of $2,811,000.00 for the second quarter of 2010 and $6,007,000.00 for the six months ended June 30, 2010, compared with a net loss of $150,150,000.00 and $145,370,000.00, respectively, for the comparable periods in 2009.

Stephen M. Rownd, Chairman and Chief Executive Officer, commented, "While the outlook for economic recovery remains uncertain, we have taken a number of strategic steps that include the continued reduction in our construction and development portfolios, as indicated in the foregoing loan mitigation table, coupled with accelerated problem asset resolution through the segregation of staffing in our special assets area and by transferring additional resources into this area. At June 30, 2010, our loan loss reserves to total loans was 2.60% and our loan loss reserves were approximately 2.8 times annualized net charge-offs. Our non-performing asset and charge-off levels may remain elevated over the next few quarters based on trends in general economic conditions and we realize the results of our strategic actions."

Non-interest income totaled approximately 8.8 million during the second quarter of 2010, rising 14% on a linked quarter basis and up 29% compared with the second quarter of 2009. During the second quarter of 2010 and 2009, the Company reported net Other-Than-Temporary Impairment (OTTI) charges taken on securities of $93,000.00 and $733,000.00, respectively. For the first six months of 2010, non-interest income, including OTTI charges, totaled almost $16.4 million compared with $13.8 million for the same period a year ago, an increase of 20%. Excluding year-to-date OTTI charges of $93,000.00 in 2010 and $733,000.00 in 2009, non-interest income improved 14% in the first six months of 2010. The principal contributors to both the quarterly and year-to-date improvements in non-interest income were higher service charge revenues on deposits together with increased annuity sales activity. The ongoing success of GreenBank's High Performance Checking product added 3,562 new net checking account customers during the

second quarter of 2010 for a new account opening ratio of 2.02 new accounts opened for each account closed.

Non-interest expenses totaled approximately $21.3 million for the second quarter of 2010, increasing less than 4% from the first quarter of 2010. Excluding the one-time, non-cash, goodwill impairment charge of $143.4 million recorded during the year-earlier quarter.

Driving the second quarter 2010 increase in non-interest expenses were normal non-executive compensation increases along with annuity sales commissions; higher advertising costs associated with a proactive program implemented to solicit customers to participate in the "opt-in" provisions of the Bank's overdraft program; higher FDIC insurance expenses and increased losses on the disposition of OREO-related properties.

35.    The Plaintiff avers that the foregoing statements were materially false and misleading because, as explained more fully herein Defendants: (1) falsely and misleadingly represented that the attempts to reduce the Company's construction and development portfolios and resolve problem assets were sufficient because Defendants knew, or were reckless in not knowing, that loans affiliated with Ross, Tipton and/or Universe were impaired or likely to become impaired, that the Company was overvaluing the collateral of such loans, that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and that there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loans. As a result, the Company's financial results were materially false and misleading at relevant times.

36.    The Plaintiff avers that an August 1, 2010 *Nashville Business Journal* article entitled "GreenBank Uses Loan Prosecution, Leadership Changes to Profit" reported the following:

Green Bankshares wrote off nearly $57 million in bad loans in the past year, littering the path it took from two years of mounting losses to consecutive profitable bankers in the first half of 2010.

The publicly traded company, which operates the 10th-largest bank in Middle Tennessee in GreenBank, hopes it has turned the corner toward sustained

profitability, a prognosis that is getting mixed reviews from analysts and local bank watchers. As its new CEO gets a handle on operations, part of the bank's plan is to curtail commercial real estate lending in favor of business lending. Still, one thing is clear. Whether GreenBank (NASDAQ:GRNB) and other mid-sized banks are successful will have a direct impact on how much money is available to businesses, since federal data shows mid-sized banks historically loan a larger percentage of their assets than large institutions or community banks.

Many eyes are on new chairman and CEO Steve Rownd, who is four months into a job that's largely involved GreenBank's leadership structure and dissenting the struggling loan portfolio- challenges he said don't detract from his faith in the bank.

"The company is managing a much broader (base of customers) than it did five years ago," he said.

Because of that, he said the bank which grew rapidly through acquisitions in Nashville and elsewhere, ended up needing more speculation. One of his first major moves was to set up a special asset department- meant to handle problem loans- led by Steve Droke, the former chief credit officer. Rownd is searching for a new credit officer to oversee loan approval, as well as a retail banking chief. Beyond those changes, Rownd- who landed the job in part because of his experience in commercial lending and risk management at various banks- said he's still analyzing the bank's portfolio but expects commercial real estate loans to become a smaller share as the bank turns more to business and consumer lending. Commercial real estate, which includes lending for commercial buildings as well as especially troublesome residential development and construction loans, made up more than 50 percent of GreenBank's portfolio.

If GreenBank succeeds in becoming a stronger business lender, it could have a major impact as another mid-sized bank entering the game, said Carter Bundy, a Richmond, Va.-based analyst with Stifel, Nicolaus & Co. of St. Louis.

"Green's going to have a little bit more of a challenge reinventing itself," he said, but if it succeeds, "it's a good place to be."

In the first quarter of 2010, the bank had about three times the amount of foreclosed property on its books as the statewide average. Those former loans, largely to developers and builders, contributed to the bank's annual losses of $5.5 million in 2008 and $155 million in 2009. Writing off loans has meant shrinking assets and deposits, but doing so is also key to improving a bank's health, and other problem numbers have moved in a positive direction. GreenBank also has improved since last year its net interest margin, the spread on which it profits from loans. It's also seen some recovery in its stock price. In early 2007, the company's stock was trading near $40 a share. As of Wednesday, shares were trading around $10.

*However, some caution there's more pain to come. Mark Muth, Nashville senior research analyst with Howe Barnes Hoefer and Arnett of Chicago, applauded Rownd for creating the special assets department, but said the bank achieved a profit in the second quarter at the cost of putting off questionable loans that will become a problem.*

"Clearly they have significant issues still to work through," said Muth, who expects the bank to lose money again at some point in 2010.

Case 3:12-cv-00925   Document 1   Filed 09/10/12   Page 37 of 64 PageID #: 102

**Until there's clarity, Rownd said there are few plans in the way of new moves- though Nashville is one of the bank's premier markets carrying more than one-third of its $2 billion in deposits.**
**Profits after Problems**

Green Bankshares wrote off a large number of problem loans to help reach profitability.

Profit/Loss
2Q 2010: $1.5M
2Q 2009: $-15.4M

Non-accrual loans
2Q 2010: $64.3M
2Q 2009: $93.9 M

Charge-offs
2Q 2010: $4.9M
2Q 2009: $93.9M

Foreclosed property on books
2Q 2010: $76.9M
2Q 2009: $34.5M

37.    The Plaintiff avers that on August 6, 2010, GRNB filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal second quarter. The Company's Form 10-Q with the SEC for the 2010 fiscal second quarter. The Company's Form 10-Q was signed by CFO Adams and reaffirmed the Company's financial results previously announced on July 21, 2010. Additionally, the Company's Form 10-Q also contained Sarbanes-Oxley required certifications signed by CEO Rownd and CFO dams, substantially similar to the certifications contained herein, which were materially false and misleading for the reasons identified herein.

38.    The Plaintiff avers that on August 6, 2010, the Company filed its Form 10-Q with the SEC for the three months ended June 30, 2010. The Company's Form 10-Q, in relevant part, stated:

**Provision for loan losses. During the three and six months ended June 30, 2010, loan charge-offs were $5,316.99 and $10,049.00, respectively, and recoveries of**

38

charged-off loans were $448 and $1,299.00. The Company's provision for loan losses decreased by $19,635.00 to $4,749.00 for the three months ended June 30, 2010, as compared to $24,384.00 for the same period in 2009. Compared with the first quarter of 2010, the provision for loan losses modestly increased $860 as the Company experienced an increase in loan defaults during the second quarter of 2010 with net loan charge-offs increasing from $3,883.00 in the first quarter of 2010 to $4,867.00 during the second quarter of 2010. The Company's allowance for loan losses decreased slightly to $50,049.00 at June 30, 2010 from $50,167.00 at March 31, 2010 while the reserve to outstanding loans increased to 2.60% from 2.52% at March 31, 2010 and 2.30% at June 20, 2009. Credit quality ratios had generally declined since September 30, 2007 through the second quarter of 2009, principally as a result of the prolonged deterioration of the residential real estate construction and development market, beginning in the fourth quarter of 2007, in the Company's urban markets, primarily Nashville and Knoxville. Beginning late in the third quarter of 2009 the Company began to witness economic stabilization beginning to materialize in certain of its major markets with this trend continuing through the second quarter of 2010. Management continually evaluates the Company's credit policies and procedures for effective risk and control management. The ratio of allowance for loan losses to nonperforming loans was 77.02%, 78.85% and 52.96% at June 30, 2010, March 31, 2010 and June 30, 2009, respectively, and the ratio of nonperforming assets to total assets was 5.61%, 5.27%, and 4.91% at June 30, 2010, March 31, 2010 and June 30, 2009, respectively. The ratio of nonperforming loans to total loans, net of unearned interest, was 3.37%, 3.19% and 4.43% at June 30, 2010, March 31, 2010 and June 30, 2009, respectively. Based on management's calculation, an allowance of $50,049.00, or 2.60% of total loans, net of unearned income, was an adequate estimate of losses inherent in the loan portfolio as of June 30, 2010. This estimate resulted in a provision for loan losses in the income statement of $4,749.00 for the three months ended June 30, 2010. If the economic conditions, loan mix and amount of future charge-off percentages differ significantly from those assumptions used by management in making its determination, the allowance for loan losses and provision for loan losses on the income statement could be materially affected. The Company's year-to-date net charge-offs as a percentage of average loans decreased from 1.08% (annualized 2.16%) for the three months ended June 30, 2009 to 0.44% (annualized 0.88%) for the three months ended June 30, 2010. Net charge-offs as a percentage of average loans were 2.25% for the year ended December 31, 2009. Management believes that credit quality indicators will be driven by the current economic environment and the resiliency of residential real estate markets. *Management continually evaluates the existing portfolio in light of loan concentrations, current general economic conditions and economic trends.* During the second quarter of 2010, the Company segregated the staffing in its special assets area and transferred additional independent resources into this area to accelerate problem asset resolution.

*Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the allowance for loan losses is adequate at June 30, 2010.* However, the provision for loan losses could further increase for the entire year of 2010 based on actions taken by the special assets area to resolve

problem loans, and if the general economic conditions continue to weaken or the residential real estate markets in Nashville, Knoxville or the Company's other markets or the financial conditions of borrowers deteriorate beyond management's current expectations.

Impaired loans, which are loans identified as being probable that the Company will be unable to collect all amounts of contractual interest and principal as scheduled in the loan agreement, totaled $124,318.00 at June 30, 2010 compared with $103,479.00 at March 31, 2010 and $109,501.00 at December 31, 2009. *At June 30, 2010, the Company classified a relationship totaling approximately $20,122.00 as impaired. The loan is current and the guarantors appear to have the necessary resources to continue to maintain the current status of credit.*

39.     The Plaintiff avers that these statements were materially false and

misleading because, as explained more fully herein, Defendants: (1) falsely and

misleadingly represented that credit quality ratios had generally declined, principally as a

result of the prolonged deterioration of the residential real estate construction and

development market, when it was Defendants' failure to adequately ensure against the

impairment of the Company's loans and adequately provision for loan losses that

principally contributed to the Company's decline in credit quality ratios; (2) failed to

continually evaluate the Company's credit policies and procedures for effective risk and

control management and failed to continually evaluate the existing portfolio in light of

loan concentrations, current general economic conditions and economic trends; and (3)

lacked a reasonable basis to represent that the Company's allowance for loan losses was

adequate because Defendants knew, or were reckless in not knowing, that loans affiliated

with Ross, Tipton, and/or Universe- which, upon information and belief, constitute loans

to which the Company was referring in §44- were impaired or likely to become impaired,

that the Company was overvaluing the collateral of such loans, that the Company was

failing to timely take impairment charges to reduce the carrying values of such loans to

appropriate market values, and that there was no reasonable factual basis for the

40

Company's valuation of the collateral for the assets associated with such loans. As a result, the Company's fiscal results were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

40.     The Plaintiff avers that on October 20, 2010, the Company issued a press release entitled "Green Bankshares Reports Net Loss for the Third Quarter of 2010." Therein, the Company, in relevant part, stated:

> **GREENVILLE, Tenn.-- (October 20, 2010)- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today reported a net loss available to common shareholders of $36.4 million or $2.78 per diluted share for the third quarter of 2010 compared with a net loss available to common shareholders of $7.7 million or $0.59 per diluted share for the year-earlier quarter. The third quarter of 2010 reflected higher costs related to loan charge-offs, property pled with losses incurred on Other Real Estate Owner (OREO) resulting from sales completed and updated property appraisals received. For the first nine months of 2010, net loss available to common shareholders was $32.9 million or $2.51 per diluted share compared with $155.6 million or $11.91 per diluted share for the first nine months of 2009. Commenting on the announcement, Stephen M. Rownd, Chairman and Chief Executive Officer, said, "*For the most part, the credit and impairment charges incurred during the third quarter resulted principally from a handful of events that occurred in the second half of the quarter. We continue to aggressively focus on dealing with our problem assets through our Special Assets Group* and, depending upon economic conditions, envision the possibility of further credit challenges through the remainder of 2010. While credit quality remains a major obstacle, *the core performance of our company is improving*. Our net interest margin, excluding interest reversals, continues to expand, and non-interest income is also growing with our increasing core deposit base. Despite the challenging environment and the losses we incurred this quarter, *our regulatory capital ratios remain quite strong.*"**
>
> **As the economy remained stubbornly sluggish during the third quarter of 2010, highlighted by the lack of meaning improvement in employment statistics and the residential real estate construction and development environment in the Company's markets, *a number of the Bank's borrowers experienced further stress, prompting the Company to engage an independent third-party loan reviewer. This review contributed to the asset quality-impact reflected in our third quarter results.***
>
> **"Efforts to reduce our commercial real estate exposure continued through the third quarter," Rownd continued. "Since the third quarter of 2009, we have reduced our overall exposure to commercial real estate by more than 18%. Over the last year, the higher risk concentrations in the speculative 1-4 family residential real estate portfolio have decline almost 32% and construction and development loans**

41

have declined by more than 39%, as indicated in the foregoing loan portfolio migration table. Accelerating our problem asset resolution remains our top priority through the focused efforts of our Special Assets Group. We continue to seek to resolve these issues in the best interests of our shareholders, with a goal of returning to profitability in 2011. Depending on general economic conditions, our non-performing asset and charge-off levels may remain elevated over the next few quarters as we realize the results of our strategic actions." Rownd also noted that the Company's loan loss reserve to total loans was 2.74% at September 30, 2010.

41.    The Plaintiff avers that on this news shares of GRNB declined $2.79 per share, more than 43%, to close on October 21, 2010, at $3.68 per share, on unusually heavy volume.

42.    The Plaintiff avers that the foregoing statements were materially false and misleading because, as explained more fully herein, Defendants: (1) falsely and misleadingly represented that the attempts to reduce the Company's construction and development portfolios and resolve problem assets were sufficient because Defendants knew, or were reckless in not knowing, that loans affiliated with Ross, Tipton and/or Universe were impaired or likely to become impaired, that the Company was overvaluing the collateral of such loans, that the Company was failing to timely take impairment charges to reduce the carrying values of such loans to appropriate market values, and that there was no reasonable factual basis for the Company's valuation of the collateral for the assets associated with such loans. As a result, the Company's financial results were materially false and misleading at all relevant times.

43.    The Plaintiff avers that in an analyst report dated October 21, 2010, Kevin Reynolds "Reynolds", an analyst with Wunderlick Securities, downgraded the Company's stock to sell from hold and lowered the target price to $2.00 per share from $7.50, stating that even at $2.00 the "new target price may ultimately prove to be

somewhat generous." Reynolds described the Company's third quarter 2010 as "horrible" and "disastrous", and stated the following:

> GRNB reported a horrible 3Q10 loss per share of $2.78, far worse than our $0.11 EPS estimate and the consensus loss per share estimate of $0.07. The company's asset quality metrics all deteriorated dramatically, resulting in a Texas ratio [a measure of the bank's credit troubles] of 114% at quarter end. With a TCE ratio [Tangible Common Equity Ratio- a ratio used to determine how much losses a bank can sustain before shareholder equity is eliminated] of just 5.09%, there is an urgent need for GRNB to raise fresh capital to absorb ongoing loan losses, but we have doubts as to whether the company can pull this off successfully.
>
> Key points
>
> -Disastrous 3Q10 on massive deterioration in asset quality. The company's 3Q10 loss per share of $2.78 was $2.89 worse than our estimate and $2.71 worse than consensus. The company's disappointing results were the result of massive deterioration in asset quality, a development that is somewhat surprising this late in the credit cycle.
>
> -Overall credit cost increase significantly. During the quarter, NCOs [net charge-offs] increased to $36.5 million from 4.9 million in the prior quarter and OREO write-downs increased from $926 thousand to $6.5 million. The provision for loan losses totaled $36.8 million (up from $4.7 sequentially) barely covering current period NCOs with no additional reserve build. The higher-than-expected provision accounted for $1.56 of the per share shortfall versus our estimate for the quarter.
>
> - NPLs [Non-Performing Loans], NCOs and total NPAs [Non-Performing Assets] all experience massive increases. Despite the sharp increase in NCOs and OREO write-downs, NPAs increased by $55 million to $197 million as OREO sales and write-downs of $11.6 million and NCOs of $36.6 million were more than offset by a $111.9 million inflow of new nonaccrual loans. The ratio of NPAs to total assets rose to 8.16% at 3Q10, up from 5.61% at 2Q10, while the ratio of NPLs to total loans increased to 6.67% from 3.34% sequentially.
>
> -TCE ratio drops significantly; more capital needed now. The company's TCE ratio fell in 3Q10 to 5.09% from 6.25% last quarter, which is the lowest such ratio among our Southern research universe (roughly 350 basis points below the average TCE ratio for Southern peers). The Texas Ratio ended 3Q10 at 114% (above 100% suggesting a deeply troubled institution), and we believe GRNB must raise additional capital immediately to survive. Unfortunately, we have doubts as to whether the company can pull this off successfully.

44.    The Plaintiff avers that other analysts reacted similarly. For instance, Brady Gailey, an analyst at Keefe, Bruyette & Woods, downgraded the Company's stock to underperform in an analyst report dated October 21, 2010, stating that "3Q Proves a Game Changer for GRNB".

43

45.     The Plaintiff avers that on November 9, 2010, after the market closed,

GRNB issued a press release entitled, "Green Bankshares Defers TARP Dividends and

Trust Preferred Interest Payments." Therein, the Company, in relevant part, stated:

> **GREENEVILLE, Tenn. - (BUSINESS WIRE)- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today announced that it has given notice to the U.S. Treasury Department that the Company is suspending the payment of regular quarterly cash dividends on the Company's Fixed Rate Cumulative Perpetual Preferred Stock, Series A, issued to the U.S. Treasury Department. Deferral of these dividends for six periods would trigger board appointment rights for the holder of the Series A Preferred Stock. The dividends will continue to be accrued for payment in the future and will be reported for the duration of the deferral period as a preferred dividend requirement that is deducted from income available to common shareholders for financial statement purposes. Additionally, the Company has also exercised its rights to defer regularly scheduled interest payments on all of its issues of junior subordinated debentures, relating to outstanding trust preferred securities (TRUPs), having an outstanding principal amount of $88.6 million. Under the terms of the trust documents, the Company may defer payments of interest for up to 20 consecutive quarterly periods without default or penalty. The regularly scheduled interest payments will continue to be accrued for payment in the future and reported as an expense for financial statement purposes. Together, the deferral of interest payments on TRUPSs and suspension of dividend payments to the U.S. Treasury Department should preserve about $5.1 million per year in bank level capital. The Company made the decision to suspend these payments in consultation with the Federal Reserve Bank of Atlanta.**

46.     The Plaintiff avers that on November 9, 2010, after the market closed,

GRNB filed its Quarterly Report on Form 10-Q with the SEC for the 2010 third fiscal

quarter. Therein, the Company, in relevant part, stated:

> **...The net loss available to common shareholders was $36,405.00 for the third quarter of 2010 compared with net income available to common shareholders of $1,561.00 during the second quarter of 2010 and net income available to common shareholders of $1946.00 for the first quarter of 2010. The principal reason for the decline from profitability in the second and first quarters of 2010 relative to a net loss available to common shareholders for the third quarter of 2010 was an increase in net loan charge-offs. The Company experienced two large credit defaults late in the third quarter of 2010 resulting in approximately $20.7 million in loan impairment charges and write-downs. These two events coupled with the weakening in new home sales during the third quarter of 2010, exacerbated by the elimination of the first-time home buyer's tax credit during the second quarter of 2010, further strained the borrowers' ability to move excess inventory. As a result, collateral**

44

dependent loans were again re-evaluated and impairment charges were taken to reduce carrying values to appropriate market values less estimated costs to dispose of these properties.

Provision for Loan Losses. During the three and nine month periods ended September 30, 2010, loan charge-offs were $37,199.00 and $47,248.00, respectively, and recoveries of charged-off loans were $650.00 and $1,949.00, respectively. Loan charge-offs were $19,224.00 and $47,591.00, respectively, for the three and nine months ended September 30, 2009. Recoveries of charged-off loans were $788 and $5,132.00, respectively, during these periods. The Company's provision for loan losses increased to $36,823.00 for the three months ended September 30, 2010, compared to $18,475.00 for the same period in 2009. Compared with the second quarter of 2010, the provision for loan losses rose by $32,074.00 as the Company experienced an increase in loan defaults during the third quarter of 2010. Contributing to a significant portion of the deterioration in the loan portfolio during the quarter ended September 30, 2010 were two large relationships totaling approximately $31.4 million, after charge-offs of $20.7 million, which defaulted during the latter part of the third quarter. These borrowers had been paying interest only and were current but new appraisals ordered during the quarter showed collateral shortfalls that caused the Company to move these relationships to non-accrual and charge them down to the collateral values. The Company's allowance for loan losses increased slightly to $50,322.00 at September 30, 2010 from $50,049.00 at June 30, 2010 while the reserve to outstanding loans ratio increased to 2.74% from 2.60% at June 30, 2010 and 2.39% at September 30, 2009. Credit quality ratios have generally declined since September 30, 2007 principally as a result of the prolonged recession and continued deterioration of the residential real estate construction and development portfolios in the Company's urban markets, primarily Nashville and Knoxville. During the third quarter of 2010 as a number of the Company's borrowers, including certain larger credit relationships, continued to experience additional economic stress and economic conditions remained sluggish, highlighted by a lack of meaningful improvement in employment statistics and the residential real estate and construction development environment, management contract with an independent third party loan review company to evaluate certain aspects of the Company's loan portfolio. As a result of this review and continued economic deterioration occurring during the third quarter of 2010 coupled with normal updated borrower financial information received during the quarter, higher loan charge-offs and impairment charges were deemed appropriate given the changing environment. Based on management's calculation, an allowance of $50,322.0 of 2.74% of loans, net of unearned income, was an adequate estimate of losses inherent in the loan portfolio as of September 30, 2010. This estimate resulted in a provision for loan losses in the income statement of $36,823.00 for the three months ended September 30, 2010. If the economic conditions, loan mix and amount of future charge-off percentages differ significantly from those assumptions used by management in making its determination, the allowance for loan losses and provision for loan losses on the income statement could be materially affected.

The Company's year-to-date net charge-offs as a percentage of average loans increased from 1.93% for the three months ended September 30, 2009 to 2.31%

(annualized 3.08%) for the three months ended September 30, 2010. Net charge-offs as a percentage of average loans were 2.25% for the year ended December 31, 2009. Management believes that credit quality indicators will be driven by the current economic environment and condition of the residential real estate markets. Management continually evaluates the existing portfolio in light of loan concentrations, current general economic conditions and economic trends. During the second quarter of 2010, the Company segregated staffing for its special assets group and transferred additional independent resources into this area in an effort to accelerate problem asset resolution.

Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the allowance for loan losses is adequate at September 30, 2010. However, the provision for loan losses could further increase for the entire year 2010 based on actions taken by the special assets group to resolve problem loans, and if general economic conditions remain sluggish or weaken further or the residential real estate markets in Nashville, Knoxville or the Company's other markets or the financial conditions of borrowers deteriorate beyond management's current expectations.

Non-performing assets ("NPAs"), which include non-accrual loans, loans past due 90 days or more and still accruing interest and OREO, totaled $197,159.00 at September 30, 2010 compared with $141,915.00 at June 30, 2010. During the three month period ended September 30, 2010, the Company experienced an increase in net NPA's of $55,244.00 as the Company continued to identify and recognize NPA's of $55,244.00 as the Company continued to identify and recognize NPA's through the efforts of the special assets group and the results of the independent third-party loan review conducted during the third quarter of 2010. The Company expects that the levels of NPA's will remain elevated through the remainder of the year and into 2011.

Non-performing loans include non-accrual loans and loans 90 or more days past due. All loans that are greater than 90 days past due are considered non-accrual unless they are adequately secured and there is reasonable assurance of full collection of principal and interest. Non-accrual loans that are 120 days past due without assurance of repayment are charged off against allowance for loan losses. Nonaccrual loans and loans past due 90 days totaled $123,460.00 at September 30, 2010, an increase of $58,477.00, from June 30, 2010 principally as a result of two large loans totaling $31.4 million, after charge-offs, added to non-accrual status during the quarter.

47.    The Plaintiff avers that on this news shares of GRNB declined $1.08 per share, approximately 30%, to close on November 10, 2010, at $2.57 per share, on unusually heavy volume.

48.    The Plaintiff avers that on February 16, 2011- two weeks after GRNB reported the Company's results for the fourth quarter and full year 2010- the Company

46

announced that, effective May 16, 2011, Adams would no longer serve as the Company's Executive Vice President and Chief Financial Officer.

49. The Plaintiff avers that additionally, in March 2011, the Company announced that it had eliminated approximately 70 employees- or about 10% of its workforce- including loan officers and other employees. The Company also announced significant changes in its management. GRNB announced that the Company's East Region Market President, former First Security Group President Lloyd "Monty" Montgomery, III, had been named interim chief credit officer. Adams said the Company will eventually look for a permanent chief credit officer, but not immediately. Also in March, 2011, the Company's Sumner County regional executive, Ed Mayberry, left the Company involuntarily.

50. The Plaintiff avers that a March 6, 2011 article published in the *Times Free Press* and entitled "Broken Dreams' reported the following:

> **JASPER, Tenn-- John and Jennifer Heimbold thought they had found their dream place to retire in 2007 when they bought a picturesque lot at Rarity Club on Nickajack Lake. But four years later, the San Diego couple are among more than 50 property owners in the lakefront resort still waiting for the promised golf course, marina and wellness center.**
> **"We're surviving, but this has devastated us," said Jennifer Heimbold, a 69-year-old retiree who said she and her husband have given up on their plans to move to Tennessee and are still in San Diego.**
> **"We looked all over and this seemed to be exactly what we were looking for, with all the amenities of a golf course, wellness center and lakefront living in a state with no income tax. This sure isn't the retirement we had planned." The Heimbolds and others collectively paid Rarity Club developers more than $26 million for lots in the 578-acre complex. But nearly five years after TVA sold the property and crews began clearing the land, there are no residents, boat slips or golf courses in what was designed to be the costliest residential development ever built in Southeast Tennessee. Mike Ross, the Maryville, Tenn., developer of Rarity Club and eight other Rarity resort communities across East Tennessee, conceded last month that he tried to build and borrow too much. When the housing slump his three years ago, he was left with too few sales and dollars to fulfill his development plans, he said. But others involved in the creation of Rarity Club insist the initial sales were**

47

enough to get far more done on the promised amenities and to spur completion of at least the first phase of Rarity Club.

"I've watched this from the ground up, and I'm very disappointed," Jasper Mayor Billy Simpson said. "The economy didn't help, but the developer didn't do what he was going to do." Chattanooga John "Thunder" Thornton, who assembled the Nickajack site by swapping other land with TVA, sold the land to Ross but is now suing him. "We have our own little Bernie Madoff of Marion County," Thornton said, referring to the former New York investment advisor now serving a 150-year prison sentence for bilking more than $18 billion from his clients.

"He [Ross] made 26.5 million if property and borrowed another $15.5 million from the bank," Thornton said "But it looks like he only put about $3 million back in this project and diverted the rest to other projects or his own use. It's just not right." Ross denies any wrongdoing. No criminal charges have been filed against Ross or his partners. Backers insist the Nickajack Lake project still has tremendous value and hope it may be completed with new owners. The bank that took over the property nearly two years ago has hired a local real estate agent to market the Rarity Cub nationwide.

"There's still a lot of money a developer can make off this property," said Tommy Stanfill, a broker for Century 21 Cumberland Realty in Jasper. For now, however, the only completed house in Rarity Club- a lakefront home priced at nearly $1.5 million- sits vacant. Another foreclosed, unfinished home on the lake is listed for $450,000.00, less than the $550,000.00 cost of the lot alone in 2007. "We feel cheated," said Laura Grody, a Chattanooga resident who bought a lakefront lot with her husband, Harold, four years ago for $390,000.00. "They sold the lots, but didn't put up the amenities they promised. We got the roads but not much else."

Big Dreams and Lawsuits

Ross acquired the 578 acres for Rarity Club from Thornton, who negotiated for three years with TVA for the lakefront property. Thornton and Ross are Maryville natives and the two biggest residential real estate developers in East Nashville. Before starting Rarity, Ross successfully built lakefront and golf course communities on Tellico Lake in the 1990s.

"When I saw the quality that Mike Ross has put together on Tellico Lake, I figured he was the right man," Thornton said in a recent interview on Rarity's history. Ross had plans for more than 10,000 high-end homes on the lakes and mountains of southern Appalachia in East Tennessee. "I had quite a bit of success when the economy was strong and the market was booming and I knew there were 76 million baby boomers coming along and starting to retire," Ross said in an interview last month. "It's a huge market, so even 10,000 homes is only a drop in the bucket."

But among nine Rarity Communities he began, four ended up in bankruptcy and two others are neither stalled or facing foreclosure. Ross still is selling lots at Rarity Bay, Rarity Pointe and Rarity Ridge. Including other undeveloped properties and affiliate businesses, seven Ross-related ventures went bankrupt.

"The market is just really, really tough right now," the 61-year old developer said. "There aren't a lot of buyers out there, but we're still going to work

every day trying to find folks that would be interested in helping us revive all of our communities when the economy improves." Waiting on Amenities at Nickajack Resort

The 578-acre Rarity Club on Nickajack Lake was designed to be the biggest residential and resort development ever in Sooutheast Tennessee, including:

-An 18-hole golf course. Land was cleared for 18 holes in the Lee Trevino-designed golf course, a pond was built and one paved path for carts was installed. But work stopped in 2007 with no holes finished.

-Boat docks and marina. No marina has been started although 336 boar slips were permitted and $1.4 million of dock equipment brought.

- Homes and utilities. Roads were built and utilities extended to most of the 165 lots platted in the first phase of the development. Of those, 59 lots were sold but only two houses have been started and one finished. None are occupied.

- Wellness center and clubhouse. The original developers planned a fitness center, swimming pool and community facilities. None has been built.

-New campground. The 57-space Shellmound Campground was to be relocated closer to the Nickajack Dam. Land was cleared, but no campground has been built.

- Hiking trails. Five miles of trails on Little Cedar Mountain with public entrance neat I-24 were built by TVA with money from the developer.

Two groups of property owners at Rarity Club have sued Ross for failing to build the gated luxury community he promised. The property owners want Ross or the bank that financed the project to complete the amenities outlined in sales brochures, although not necessarily specified in the property deeds. The civil suits are pending in Hamilton County Circuit Court. No trial date has been set, although Ross and others have given depositions. Ross claims he ran out of money when the real estate market collapsed in late 2008. Thornton says he lost at least $10 million from the collapse of Rarity Club, although Ross paid him enough to cover his initial investment plus more than $3 million from early lot sales. Thornton has developed his own high-end properties in Tennessee, Wyoming, Utah and Hawaii. He rejects Ross's claim that Rarity Club stalled strictly because of the economy.

"The money he got from the sale of these properties was enough to build most of the amenities he promised, but he took that money and spent it elsewhere," Thornton said. John Harvey Cameron, a Jasper attorney who represents his wife and six other homebuyers at Rarity Club, claims in court documents that Ross "engineered the diversion of funds and sale proceeds of well in excess of $10 million [from Rarity Club] for other purposes." Cameron's lawsuit accuses Ross of "breach of fiduciary duty, misappropriation, mismanagement, misrepresentation, fraud and negligence."

Ross said he lent $6 million from Rarity Club to a Campbell County development, Rarity Mountain. The loan was later converted to an equity investment in Rarity Mountain, but the money was lost when Rarity Mountain filed for bankruptcy. Ross said he also brought money to Rarity Club from other projects and used it to develop several miles of roads for the first 165 lots.

New Owners, New Hope

49

Green Bank, which acquired Rarity Club in August 2009 by foreclosing on Ross' partnership, is trying to revive the project by hiring Century 21's Stanfill to market the property. Most of the developed acreage was mowed in the past two weeks to help lure more buyer interest. Green Bank also agreed to cut the listing price of the 578 acres from the foreclosed price of $15.8 million to $14.3 million. Standing atop a hill overlooking the subdivision streets and home lots platted along the winding shoreline of the Nickajack Resevoir, Stanfill called the picturesque site "one of the most beautiful you'll find anywhere."

"Where else can you be on a gorgeous lake like this with the mountains all around it only a 20-minute drive from Chattanooga?" he asked. "It's too good of a piece of property not to have someone come in and develop it. It's going to happen.

Sacred Little Cedar Mountain

Thornton convinced TVA to sell the land by donating to TVA more than 1,000 acres on Burns Island and Cedar Mountain- both sites that archaeologists determined were more important to protect. But American Indian groups opposed the initial deal and say the area's history should be preserved. Rarity Club is built opposite the former site of towns called Nikajack and Running Water where Chief Dragging Canoe lived after he left Chickamunga Creek in the 18th Century.

Tom Kunesh, former state commissioner of Indian Affairs, said he used to walk and hike regularly in what he calls "most beautiful place" on the Nikajack site. "This is sacred land and should be protected," he said. Corky Allen, a paralegal in tribal Indian affairs, said he hopes there is no development. "These are public lands that should never have been used for private profit," he said. "TVA needs to undo what should never have been done."

But Stanfill, a 23-year real estate veteran in Jasper, insisted the Rarity Club project "means too much to our community for it to just sit there." Ross paid TVA to develop five miles of trails on Little Cedar Mountain near Interstate 24 and was required to make at least one fourth of the marina open to the public.

"Rarity Club is such a big thing for our community- just like a major new industry," Stanfill said. "It's not a question if this will be finished. It's just a question of when and how."

51.     The Plaintiff avers that an April 21, 2011 article in The Daily Times

"Retirement Development Faces Exposure" reported the following:

GreenBank is foreclosing on 40 acres adjacent to Asbury Place on Sevierville Road in Maryville that were previously being developed to be an active adult retirement community. The borrowers listed by the successor trustee on the trustee's sale notice are real estate agent Darrell Tipton and developer Mike Ross, both of Maryville. The $3 million commercial note held by the bank was agreed to in October 2005. According to Tipton, the default on the loan stemmed from three main factors: the collapse of the real estate market, the decision by Asbury Place to not follow through on an agreement to establish a connection between Tipton's

50

development and Asbury, and a decision by GreenBank to no longer accept just interest payments on the loan. It's that last element that has brought forecloure to the project that has roads and utilities for 120 zero lot line residences and room for 80 more. Tipton said GreenBank came to him about 90 days ago and asked what his plans were for the property.

"I was content to sit here and pay interest, hoping that eventually this market is going to turn around," Tipton said. GreenBank- dealing with $145.8 million in nonperforming loans it reported at close of 2010- was not willing to wait.

"That decision was not done locally- I can't say anything but nice about them. But people in Greeneville or the federal people are calling the shots," Tipton said. There's right at $3 million owed. The bank wants 10 to 20 percent capital reduction or to set up on amortization. They weren't happy with just catching the interest." The interest, which had started at 3.5 percent, rose to 6 percent, according to Tipton.

A GreenBank official said the bank could not comment except to refer to the public notice. Tipton said he decided to get out when continuing the project seemed hopeless. "It got to the point where you can only pour money down a well for so long."

*Tipton and Ross, who did not return a phone call, have invested together previously. They jointly sold the luther Jackson farm property on Old Knoxville Highway at Pellissippi Parkway through the Blount Country Economic Development Board which has installed infrastructure at its Pellissippi Place venture.The joint investors on the research and development park are Blount County, Knox County, Maryville and Alcoa. Greenbank has previously loaned money to Ross for his Rarity Community resort and residential developments, and foreclosed on some.*

*Asbury Centers, Inc. sold the 40 acres next to its retirement community in 2005 after deciding not to develop the land itself but to let a professional real estate developer handle the project, according to Tipton.*

*"They discovered they did not have the expertise," he said.*

*Asbury already has independent living residences on its property. When owners of those units decide to transfer into an Asbury facility with a higher level of care, an agreement assures Asbury will buy back the residence and put it back on the market. Tipton said he and Asbury had agreed to work out a similar buy-back and services arrangement with his development.*

"I thought we were rocking and we had an investor willing to help build. Then Asbury changed their mind." Tipton attributed the change in the plan to a change in management at Asbury Place. "Nothing in writing."

Bernie Bowman, who was chief executive officer at Asbury at the same time of the sale, said he had discussed a contractual arrangement with Tipton, but there was no contract signed, no agreed-to dollar amount, and no agreement about what services would be rendered. He agreed Asbury had undergone a change in management and new long-range plan had been established that did not include the 40-acre development. The plan called for higher density development on Asbury's existing property.

"In the conversation we said to him, as he started marketing, that if he wanted to offer a package that included meals and activity space, we would be

Case 3:12-cv-00925   Document 1   Filed 09/10/12   Page 51 of 64 PageID #: 116

willing to develop the product and he would pay us. It was not the full continuum of services," Bowman said.

"It was a verbal agreement, nothing in writing, just conversation." Then came the delays over several years, according to Bowman. "If he had gone about marketing in a timely manner, and if I had continued as CEO, we may have very well put that package together. But he was not able to market in the time frame."

He also noted that Asbury had already shown it was capable of developing privately-owned residential units without turning the project over to outside developers.

"I think that sometimes people in real estate don't realize that marketing an active adult retirement community is a different product. Mr. Tipton didn't have that experience," Bowman said.

"Tipton said it took time to get Maryville Planning Commission approval. The city also delayed the start of grading until access to Sevierville Road was approved, and that required engineering studies. As infrastructure development began, inadequate soil was discovered. Dirt that would not compact properly had to be removed and replaced. "It finally got to the point where we were getting close to finishing it up. We had a party interested coming into the venture and building homes. During that time Asbury changed management, said basically, we're not interested in doing that, we're going in another direction. Consequently we lost our investor interest," Tipton said.

In 2007-2008 the real estate market plummeted and new construction nose-dived. Bowman acknowledged that challenges to the project, but rejected the idea that Asbury was a primary reason it failed.

"The idea that this (change in Asbury's plan) would be one of the proverbial straws that broke the camel's back is stretching it," Bowman said.

Asbury Project Proceeds

Currently, a foreclosure looms next door, Asbury is well along in implementing its long-range plan. Construction is under way at Asbury Place on its new St. Claire Apartments, part of a $6 million project that also includes a new wellness center and dining room and renovations to the existing clubhouse. Construction is expected to be completed by spring of 2012.

Joy Evans, The Asbury Group's regional director of marketing, said commitments to buy St. Claire Apartments have been going well. Only eight units are left.

"It's done so well we've already added one building," Evans said. "We're very pleased with the way things are going."

As for the 40-acre project, Tipton believes he knows what's next. "I think you'll see the bank buy it back. I'd be surprised if that's not what happens," Tipton said.

52.     The Plaintiff avers that on May 2, 2011, the Company announced that

Michael Fowler will serve as Senior Vice President and CFO upon Adams' departure on

May 16, 2011.

53. The Plaintiff avers that the market for GRNB's securities are open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, GRNB's securities traded at artificially inflated prices. The Plaintiff and others have been damaged thereby.

54. The Plaintiff avers the Defendants materially misled the investing public, thereby inflating the price of GRNB's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about GRNB's business, operations, and prospects as alleged herein.

55. The Plaintiff avers that at all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and others. As described herein Defendants made or caused to be made a series of materially false and/or misleading statements about GRNB's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements resulted in the Plaintiff purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION AND ECONOMIC LOSS

56.     The Plaintiff avers that Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by him and others. The Plaintiff and others purchased GRNB's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

57.     The Plaintiff avers that specifically, on October 20, 2010, the Company issued a press release entitled "Green Bankshares Reports Net Loss for the Third Quarter of 2010." Therein, the Company stated "[a]s the economy remained stubbornly sluggish during the third quarter of 2010, highlighted by the lack of meaningful improvement in employment statistics and the residential real estate construction and development environment in the Company's markets, a number of the Bank's borrowers experienced further stress, prompting the Company to engage an independent third-party loan reviewer. This review contributed to the asset quality-impact reflected in our third quarter results." On this news, shares of GRNB declined $2.79 per share, more than 43%, to close  on October 21, 2010, at $3.68 per share, on unusually heavy volume.

58.     The Plaintiff avers that additionally, on November 9, 2010, after the market closed, the Company announced that in consultation with the Federal Reserve Bank of Atlanta, the Company had given notice to the United States Treasury Department that the Company was suspending the payment of regular quarterly cash dividends on the Company's Fixed Rate Cumulative Perpetual Preferred Stock, Series A, issued to the

United States Treasury Department. Further, the Company disclosed that "two large relationships totaling approximately $31.4 million, after charge-offs of $20.7 million," had defaulted during the third quarter. According to the Company, "these borrowers had been paying interest only and were current but new appraisals ordered during the quarter showed collateral shortfalls that caused the Company to move these relationships to non-accrual and charge them down to the collateral values." On this news, shares of GRNB declined $1.08 per share, more than 29.5%, to close on November 10, 2010, at $2.57 per share, on unusually heavy volume.

59.     The Plaintiff avers that as alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, his/her control over, and/or receipt and/or modification of GRNB's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

60.     The Plaintiff avers that the market for GRNB's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or

misleading statements and/or failures to disclose, GRNB's securities traded at artificially inflated prices. On May 12, 2010, the Company's stock closed at a Class Period high of $14.77 per share per the Burgraff Class. The Plaintiff and others purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of GRNB's securities and market information relating to the Company, and have been damaged thereby.

61.     The Plaintiff avers that during the Class Period per the Burgraff Class, the artificial inflation of GRNB's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by the Plaintiff and other members of the Burgraff Class. As described herein, during the Burgraff Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about GRNB's business, prospects, and operations. These materials and/or omissions created an unrealistically positive assessment of GRNB and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affecting the value of the Company's stock. Defendants' materially false and/or misleading statements during the Burgraff Class Period resulted in the Plaintiff and other members of the Burgraff Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them damaged as a result.

62.     The Plaintiff avers that at all relevant times, the market for GRNB's securities was an efficient market for the following reasons, among others:

(a)     GRNB stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, GRNB filed periodic public reports with the SEC and the NASDAQ;

(c)     GRNB regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disorders, such as communications with the financial press and other similar reporting services; and,

(d)     GRNB was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

## NO SAFE HARBOR

63.     The Plaintiff avers that the statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any

57

forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of GRNB who knew that the statement was false when made.

**FIRST CAUSE OF ACTION**
**VIOLATION OF SECTION 10(b) OF**
**THE EXCHANGE ACT AND RULE 10b-5**
**PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

64. The Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65. The Plaintiff avers that during the Burgraff Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase GRNB's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

66. The Plaintiff avers that Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) make untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of businesses which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for GRNB's securities in violation of Section 10(b) of the Exchange Act and Rule

58

10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

67.     The Plaintiff avers that Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about GRNB's financial well-being and prospects, as specified herein.

68.     The Plaintiff avers that these Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of GRNB's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material and and/or omitting to state material facts necessary in order to make the statements made about GRNB and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Burgraff Class Period.

69.     The Plaintiff avers that each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a

59

senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

70. The Plaintiff avers that Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing GRNB's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71. The Plaintiff avers that as a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth

above, the market price of GRNB's securities was artificially inflated during the Burgraff Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Burgraff Class Period, the Plaintiff and the other members of the Burgraff Class acquired GRNB's securities during the Burgraff Class Period at artificially high prices and were damaged thereby.

72.     The Plaintiff avers that at the time of said misrepresentations and/or omissions, the Plaintiff and other members of the Burgraff Class were ignorant of their falsity, and believed them to be true. Had the Plaintiff and the other members of the Burgraff Class and the marketplace known the truth regarding the Company's businesses, operations, and prospects, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their GRNB securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     The Plaintiff avers that by virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     The Plaintiff avers that as a direct and proximate result of Defendants' wrongful conduct, the Plaintiff and the others suffered damages in connection with their respective purchases and sales of the Company's securities.

61

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 20(a) OF THE
## EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

75.     The Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     The Plaintiff avers that the Individual Defendants acted as controlling persons of GRNB within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     The Plaintiff avers that in particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     The Plaintiff avers that as set forth above, GRNB and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as

alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff seeks the following relief:

1.      That the Plaintiff be awarded compensatory damages in an amount in excess of $75,000.00, against the Defendants, jointly and severally;

2.      That the Plaintiff be awarded treble damages against the Defendants, jointly and severally;

3.      That the Plaintiff be awarded punitive damages in an amount in excess of $100,000.00 against the Defendants, jointly and severally;

4.      That a jury of six be impaneled to hear this action;

5.      That the Plaintiff be awarded attorneys fees and other costs in prosecuting this action;

6.      That the Plaintiff be awarded such other relief to which he may be entitled.

Respectfully submitted,

G. Kline Preston, IV
TBPR #17141
Kline Preston Law Group, P.C.
Belle Meade Office Park
4515 Harding Pike, Suite 107
Nashville, TN 37205
Tel: (615) 279-1619
Fax: (866) 610-9565

64